Nanette DemBitz, J.
In this juvenile delinquency proceed-
ing against a 14-year-old respondent, the petitioner, a police detective, alleged respondent’s possession of a ".32 caliber colt police revolver * * * [serial number specified] loaded with five rounds of live .32 caliber ammunition” and "a .32 caliber colt revolver * * * [serial number specified] loaded with six rounds of live .32 caliber ammunition”, and that these acts, if committed by an adult, would constitute the crimes of criminal possession of weapons under sections 265.02 and 265.05 of the Penal Law. The motion to suppress such revolvers, seized from respondent’s possession, is denied.
At the hearing on the motion to suppress, the evidence established that a crucial step in the events leading to the seizure of the guns was the detective’s seizure of photographs of respondent with firearms in his hands (those appeared to be a sawed-off shotgun and a revolver). The initial issue of law is whether respondent has standing to object to the presumably illegal seizure of the photographs from a third person, and to secure suppression of the guns on the ground of such illegality.
1. seizure of photographs
The events leading to the seizure of the photographs were as follows: the petitioner detective was a member of a police squad specially assigned for some months to police youths of Chinese ancestry engaged in violence on the lower East side of Manhattan (colloquially termed "violent Chinese youth gangs in Chinatown”). While on automobile patrol with an accompanying policeman, the detective saw a juvenile, one David Chan, for whom he had a warrant of arrest on a charge of possession of a gun, in front of a "club.” By the time the officers parked their car and approached the club on foot, Chan had disappeared. They stationed themselves at a back door of the club, heard the peephole of another door and then that door open, and saw four youths (none being Chan) exit and cross the street. The four were searched on the street by the two officers, presumably illegally. The search of respondent revealed nothing, but the detective found six snapshots of respondent holding firearms, in the jacket pocket of another juvenile, one Paul Wong.
*913 After the seizure of the snapshots and conversation about them with respondent (discussed below), the detective accompanied respondent to his nearby family apartment; respondent unlocked the door, and indicated that he had guns in the top drawer of a dresser. The detective took the guns here in issue from the drawer.
STANDING TO OBJECT TO SEIZURE OF PHOTOGRAPHS
Respondent argues that he can object to the seizure of the photographs on the ground that they were his property though in Wong’s possession. The court finds that respondent’s initial testimony that he "gave” the photographs to Paul Wong referred to an unconditional transfer, with no provision for a return to respondent. In any event, the determination of whether an individual’s Fourth Amendment rights have been violated and he thus has standing to object to a seizure, depends on whether there has been an invasion of his "’right of privacy of person or premises’” (Alderman v United States, 394 US 165, 173), rather than on rules as to transfer of title. "Rather than property rights, the primary object of the Fourth Amendment was determined to be the protection of privacy.” (Cardwell v Lewis, 417 US 583, .589; the same: Warden v Hayden, 387 US 294, 304.) "One who seeks to challenge the legality of a search * * * [must] establish, that he himself was the victim of an invasion of privacy.” (Jones v United States, 362 US 257, 261.)[1] Respondent’s "reasonable expectation of freedom from governmental intrusion” related to his own person, not to Wong’s (see Mancusi v Forte, 392 US 364, 368; see, also, Frazier v Cupp, 394 US 731, 740). Clearly, even if respondent had given the photographs to Wong with an expectation of their return, he has no standing to object to an illegal seizure of them from Wong.
Respondent also argues that the circumstance that respondent and Wong were in the same group, standing near each other and searched simultaneously, confers standing on respondent to object to the illegality of the search of Wong. But even closer connections between a defendant and the person searched have been held insufficient to confer standing. Thus, the rule of personal standing even governs in a conspiracy *914 prosecution to preclude a defendant from objecting to an illegal seizure from a coconspirator. (Alderman v United States, 394 US 165, supra; and, see, Frazier v Cupp, 394 US 731, 740, supra.)
Nor does the special rule of People v Stojeck (29 NY2d 798) apply. Defendant’s standing therein to object to the illegal search of another depended on the circumstance that such search was directed at the defendant as well as the person searched (see People v Stojeck, 34 AD2d 205, 210, 212). Here, the detective had Wong and David Chan (as well apparently as respondent) under surveillance for some months; and the events here under consideration stemmed from his effort to find David Chan, rather than to secure evidence against respondent.
Respondent’s argument, that the deterrent purpose of the exclusionary rule should be implemented by permitting respondent to object to the seizure from Wong, tracks the argument unequivocally rejected in other cases of lack of standing. (See United States v Calandra, 414 US 338, 571, 573.)
Accordingly, respondent cannot object to the detective’s use of the photographs as a basis for the search of respondent’s room.
2. JUSTIFICATION FOR WARRANTLESS SEARCH
Three of the photographs showed respondent holding one type of gun in a room which appeared to be a sitting room of a home, and the other three showed him in the same room with another type of gun. Comparing the photographs with respondent’s clothing, hair length and other features when he was in court on the motion three days after the seizure of his guns, it was reasonable for the detective to infer that the photographs had been taken very recently. It could also be reasonably inferred that the pictures were taken in respondent’s family’s apartment; with a youthful respondent with no place other than his family home to keep his possessions, the probability was that the pictured home was his family home. Finally, comparing the firearms as pictured with numerous operable guns seen in court, they appeared to be in good condition (new and with no parts missing); at the least it was highly probable that respondent’s possession of the pictured black revolver violated subdivision g of section 436-5.0 of the *915 Administrative Code of the City of New York, which prohibits possession of a black imitation revolver.
Accordingly, the detective had probable cause to believe respondent had recently committed, or was presently committing a crime and that contraband guns — the evidence of his crime of possession — were in his home. By the same token as there was probable cause to arrest respondent on the basis of the photographs, there was probable cause to search the place where respondent was most likely to keep the guns with which he was pictured. (See Chambers v Maroney, 399 US 42, 47-48.)
FAILURE TO OBTAIN WARRANT
While a search warrant thus could have been validly obtained, the question remains of whether there was an exigency which justified the detective’s failure to secure a warrant to search respondent’s home. The issue of the exigency for a warrantless search turns on whether the sought object can be easily destroyed (Cupp v Murphy, 412 US 291) or moved (Chambers v Maroney, supra). Certainly guns can be quickly and easily moved and secreted; and even if the detective had arrested respondent, Wong or respondent’s other companions might well have taken the arrest as a signal to remove the guns from respondent’s apartment. (See Warden v Hayden, 387 US 294, 298-299, supra, as to the essentiality of speed in a search for weapons.)
Respondent suggests that the detective could have stationed his fellow officer at the door of respondent’s apartment building so that no one could leave the building with the guns, while he procured a warrant. As in Chambers, however, where the court rejected the practicality of methods other than a warrantless search, it is clear that there are many possibilities rendering respondent’s suggestion impractical (such as the possibilities of someone’s throwing the guns out of the window or moving them to another apartment in the building or of more than one exit from the building). As Corporation Counsel argues, other than taking respondent and his three companions into custody to prevent a removal of the guns (an excessive and obviously unconstitutional measure), the detective had no reasonable alternative to the immediate search of respondent’s apartment.
Applicable here is the reasoning in the automobile cases, as reviewed in Chambers (399 US 42, 51, supra): "Carroll, supra, *916 holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car’s contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible.” (Cf. Cady v Dombrowski, 413 US 433, 443; see People v Singleteary, 35 NY2d 528.)
Here the warrantless search was limited, as it must be, to securing the necessary object (see Cupp v Murphy, 412 US 291, 296, supra); and it was justified and constitutional because of the exigency arising from the ease with which respondent’s guns could have been moved and concealed.
3. RESPONDENT’S STATEMENTS PRIOR TO SEARCH OF APARTMENT
While the court has concluded that the photographs of respondent in possession of guns justified the search, it will also consider Corporation Counsel’s argument that respondent’s statements on the street when the detective showed him the photographs, furnished a constitutional basis for the search of respondent’s apartment.
Showing the snapshots to respondent, the detective said: "I want those guns.” Respondent replied, according to the credible testimony of the detective, that he didn’t have the pictured guns, but had some others in his apartment.[2] Respondent and Paul Wong both testified that neither on this nor any other occasion had the detective during his many months of surveillance in the area and conversations with them ever used any physical force or dealt with them in a harsh or abusive manner. Nevertheless, and despite the verbiage of a proffer of information in respondent’s reply to the detective, his statement cannot be viewed as truly voluntary; Corporation Counsel’s argument on this score must be rejected. (See Schneckloth v Bustamonte, 412 US 218, 248.) Respondent’s remark that he had guns in his apartment therefore presents the issue of the legality of the detective’s questioning him about the whereabouts of the pictured guns.
Since the photographs gave reasonable grounds for suspicion that respondent had recently committed or was still committing the crime of illegal possession of a gun, the "stop- *917 and-frisk” law (CPL 140.50) authorized the detective to stop respondent. The law’s dual purposes of apprehending criminals and preventing the continuance of crime[3] were both served by the detective’s act. The more difficult issue is whether the questioning of respondent exceeded permissible limits.
While New York’s "stop-and-frisk” law provides for questioning as to the suspect’s "name, address and an explanation of his conduct”, the "common-law power to inquire” may be broader in regard to the scope of the questions. (See People v Cantor, 36 NY2d 106, 112.) Nor does the Constitution appear to limit the police power to stop and question as narrowly as the New York statute, although the precise scope of permissible questioning remains undefined. (See Terry v Ohio, 392 US 1, 30, 34 [constitutional to address "questions” to suspect "in an effort to prevent or investigate crime”]; [White, J., concurring: "pertinent questions” may be directed to suspect]; Adams v Williams, 407 US 143, 146 ["A brief stop of a suspicious individual, in order to determine his identity or * * * while obtaining more information” is permissible].) Here where respondent was stopped on the basis of photographs showing him in possession of apparent contraband, a question as to the whereabouts of the contraband seems permissible.
Respondent invokes the rule of Miranda v Arizona (384 US 436, 467-473) as to the necessity for warnings prior to the questioning of a suspect. However, while a person subjected to a police street stop is by definition under temporary restraint, it has never been thought that he should be deemed in custody in the Miranda sense or that the Miranda rule applies to investigative questioning during a brief stop. (See Terry v Ohio, 392 US 1, supra; Adams v Williams, 407 US 143, 145-146, supra; Schneckloth v Bustamonte, 412 US 218, 232, supra.) By the same token, the special protection afforded juveniles by the guarantee of the presence of a parent during a Miranda questioning, is inapplicable to brief, on-the-street, investigative questioning; a contrary conclusion would abrogate the "stop-and-frisk” law in relation to juveniles.
Respondent’s attorney’s ingenious attempt to invoke the rule of Wong Sun v United States (371 US 471) is defeated by the chronology of events in the case at bar. Clearly, the *918 questioning of respondent was unconnected with the prior search of him and occurred only after the photographs gave reasonable grounds to suspect him of crime.
Both the legality of the search apart from the questioning, and its legality on the basis of the questioning, revolve around the detective’s reliance on photographs of apparent recent vintage showing respondent in possession of firearms. Since respondent has no right to object to such reliance, the seizure of the guns was legal and the motion to suppress their use in evidence is denied.

. The principles as to lack of standing of course apply to the use of illegally seized objects as clues to secure evidence against a defendant, as in the case at bar, as well as to objects introduced in evidence against him at trial. (See Goldstein v United States, 316 US 114, 121.)

. The detective, however, apparently was unsure of whether his search of respondent’s apartment would disclose the pictured guns or others.

. See Sibron v New York (392 US 40, 66, 67); People v Moore (32 NY 2d 67, 70, 71); Matter of Herman S. (79 Misc 2d 519, 521).