UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4624

ANTHONY AYENI JONES, a/k/a AJ,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge
(CR-96-458-WMN, CR-97-355-WMN)

Argued: December 3, 1999

Decided: May 26, 2000

Before WILKINSON, Chief Judge, KING, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Collins Brennan, Jr., KNIGHT, MANZI, NUSS-
BAUM & LAPLACA, Upper Marlboro, Maryland, for Appellant.
Robert Reeves Harding, Assistant United States Attorney, Baltimore,
Maryland, for Appellee. **ON BRIEF:** Robert L. Lombardo, Jr.,
KNIGHT, MANZI, NUSSBAUM & LAPLACA, Upper Marlboro,
Maryland, for Appellant. Lynne A. Battaglia, United States Attorney,
Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Anthony Ayeni Jones was charged and convicted of conspiracy to murder and kidnap in aid of racketeering, three counts of murder in aid of racketeering, conspiracy to murder in aid of racketeering, conspiracy to retaliate against witnesses, and conspiracy to distribute narcotics. On August 25, 1998, the district court sentenced Jones to life imprisonment. Jones appeals his conviction on several grounds, and we affirm.

The charges against Jones alleged a wide-ranging, drug-selling conspiracy and several acts of violence in furtherance of the conspiracy from 1989 to 1997. The trial lasted two months and involved over fifty-eight witnesses. The errors Jones alleges on appeal refer to discrete decisions by the trial court, and we present here only the factual context surrounding each claim.

I

In October 1991, Jones was arrested by Baltimore City police and charged in 17 Maryland state indictments alleging primarily conspiracy to distribute narcotics, distribution of narcotics, and firearms violations. Jones entered into a plea agreement on April 1, 1992, in which he agreed to plead guilty to one count of conspiracy to distribute cocaine during the period of March 27, 1991, to October 10, 1991, in exchange for certain recommendations and promises by the state prosecutors. The plea agreement was never reduced to writing, and the only record of its parameters is contained in a colloquy among Jones' attorney, the state prosecutor, and the state judge during Jones' plea hearing in state court. The transcript of this proceeding reveals that the state prosecutor stated that there would be no federal prosecution "with respect to this particular incident," and the state judge clarified that "the Federal Government will not be prosecuting their charge." J.A. 453-55.

In the federal proceedings, the state prosecutor testified that, during Jones' 1991-92 state prosecution, she knew that the U.S. Attorney's Office was investigating the straw purchase of handguns by Jones and that federal officials were not involved in the drug investigation at that time. The Assistant United States Attorney involved in both cases testified that on November 5, 1991, she initiated "an investigation into violations of federal firearms law specifically relating to the making of false statements in connection with the purchase of firearms from a federally licensed firearm dealer." J.A. 195-96. Her investigation authorization sheet, bearing the date November 5, 1991, was admitted into evidence and showed an investigation only of straw purchases of firearms pursuant to 18 U.S.C. § 922(a)(6). She further testified that, before Jones' state plea hearing, she told the state prosecutor that she was not going to prosecute the firearms charges and that the state prosecutor could relay this to Jones' attorney. Neither Jones nor his attorney in the state case testified as to their understanding of the scope of the April 1992 plea agreement.

Counts I and VII of the indictment in the federal case charged racketeering activity and a conspiracy to distribute narcotics, respectively, from 1989 through May 14, 1997. At Jones' federal trial, a Baltimore City detective testified about narcotics and firearms that he seized from Jones on June 21, 1991, and October 10, 1991. Jones contends that the charges brought in Counts I and VII and the introduction of evidence gathered between the state-charged dates of March 27 and October 10, 1991, constituted a violation by the federal government of his April 1992 plea agreement.

When a district court's construction of a plea agreement hinges on a factual determination, its decision is reviewed only for clear error. United States v. Conner, 930 F.2d 1073, 1076 (4th Cir. 1991). The district court, after reviewing the evidence presented to it concerning the scope of the 1992 plea agreement, held that "the only reasonable conclusion that can be reached is that all of the parties understood that [the federal prosecutor's] promise was limited to an agreement not to prosecute Mr. Jones on the federal firearms charge. There was no evidence presented to the Court that any broader agreement was ever discussed, much less agreed upon." United States v. Jones, Nos. CR-96-458; CR-97-355 (D. Md. April 20, 1998), at 5-6 (unpublished memorandum opinion).

3

We cannot conclude that this finding was clearly erroneous. Because Jones was not prosecuted for firearms violations in the federal case, the United States District Court did not fail to adequately enforce the plea agreement.

II

On March 6, 1997, codefendant Daniel Ross entered an agreement with the prosecution by which he agreed to plead guilty and cooperate as a witness against, among others, Jones. After he pled guilty, he was sent to the Charles County Detention Center (Charles County) in Maryland. One to two months later, the United States Marshals Service, which is responsible for federal prisoner movement, sent Jones to Charles County. When Ross first saw Jones in his housing unit, he was "shocked" and afraid for his safety. J.A. 233. Ross stated that he was moved to Charles County in the first place for his protection, so that he would not have contact with the codefendants against whom he would be testifying.

The federal prosecutor stated that the prosecution "didn't have anything to do with placing these two people together and it came as much of a surprise and shock to us as it did to Mr. Ross." J.A. 256. Ross testified that the prosecutors never gave him instructions to elicit information from Jones at Charles County. Ross had several conversations with Jones when they were in the same housing unit at Charles County, but Ross testified that he could not recall who initiated the conversations. During one of these conversations, Jones told Ross that the prosecution would not have anyone to identify him for one of the murders in the indictment "because we were wearing masks." J.A. 265. This statement was consistent with eyewitness accounts of the murder, and Ross testified about Jones' statement at trial. Jones contends that the use of Ross' testimony violated his Sixth Amendment right to counsel under Massiah v. United States , 377 U.S. 201 (1964).

In Massiah, the Supreme Court held that the Sixth Amendment was violated "when there was used against [the defendant] at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." Id. at 206. The critical question here is whether the government deliberately elicited the statements Jones

4

made to Ross. The district court found that there was no evidence that the government instructed Ross to speak to Jones, that it deliberately placed the two together, or that it paid Ross to provide information concerning Jones. In fact, out of concern for the safety of their witness, the prosecution specifically did not want Ross and Jones to have any contact before Jones' trial. There can be no finding of deliberate elicitation, and thus no Massiah violation, when the above-mentioned "crucial indicia of government cooperation are lacking." United States v. Love, 134 F.3d 595, 604 (4th Cir. 1998). Based on the district court's findings, the use of Ross' testimony at trial did not violate Jones' Sixth Amendment rights.

III

One of the crimes charged in Jones' indictment was the murder of Keith Westmoreland on October 25, 1994. Two gunmen wearing masks entered Westmoreland's home, and one of them shot Westmoreland to death. Frederick Ceruti, a Baltimore homicide detective, was called to investigate the murder. At the crime scene, Sheila Coleman, the mother of the victim, told Detective Ceruti that she believed Jones might have been involved in the murder because he and Westmoreland were having a dispute over a woman. She also informed Detective Ceruti that Jones had an outstanding arrest warrant for malicious destruction of property. Witnesses at the scene of the Westmoreland murder described one of the criminals as approximately six feet tall, dark complected, thinly built, and wearing a multicolored shirt. When Detective Ceruti returned to his office, he received a phone call from an anonymous male caller stating that the person involved in the killing of Westmoreland was Jones and that the masks and guns could be found in Jones' home.

Detective Ceruti located an open arrest warrant for malicious destruction of property that had been issued approximately one year earlier and arrested Jones at his home. Jones matched the physical description given by witnesses at the murder scene and was wearing a multicolored shirt. When they returned to the police station, Ceruti requested a crime lab technician to perform a gunshot primer residue (GSR) test on Jones. The GSR test consists of dabbing part of the subject's hands, primarily the web of flesh between the thumb and forefinger, with a cloth pad or swab. The sample is then scanned by an

5

electron microscope for three rare elements that are usually only found together in gunshot primer. The test revealed primer residue on both of Jones' hands, and this evidence was introduced at trial.

Jones contends that the GSR test was conducted in violation of his Fourth Amendment rights and that the district court erred in allowing it to be introduced into evidence. Jones does not challenge the validity of his arrest under the warrant but argues that, because the GSR test was unrelated to the crime for which he was arrested, it amounted to an illegal search.

Though a search of an individual usually requires a valid warrant supported by probable cause, government agents may conduct a warrantless search if exigent circumstances exist. In Cupp v. Murphy, 412 U.S. 291 (1973), for example, Murphy, the husband of a strangulation victim, voluntarily made an appearance at the police station. Although he was not arrested, the police had probable cause to believe that Murphy had committed the murder. Id. at 294-95. During questioning, the police noticed that Murphy had blood on one of his fingernails. They then forcibly took scrapings from his fingernails without his consent. The Supreme Court upheld this warrantless search, citing the limited intrusion undertaken and the readily destructible nature of the evidence. Id. at 296; cf. Schmerber v. California, 384 U.S. 757 (1966) (upholding the removal of blood from a DUI suspect due to the evanescence of the evidence of alcohol content).

As in Cupp, the warrantless search of Jones was supported by probable cause. Based on Coleman's statement suggesting Jones as a suspect, the similarities between Jones' appearance and the eyewitness descriptions, and the anonymous tip stating that Jones committed the murder, Detective Ceruti had probable cause at the time he requested the GSR test to believe that it would uncover evidence of the crime. This conclusion is supported by the fact that Detective Ceruti was able to obtain a search warrant for Jones' residence on the same day.

The fingernail scraping in Cupp and the GSR test here are very similar. In both cases, the evidence sought could be easily destroyed by the suspect washing his hands. Both searches involved removing a substance from the surface of the suspect's hands by unobtrusive means. Jones was also subjected to a less severe personal intrusion

6

than was involved in Cupp. The police temporarily seized Murphy in order to take the fingernail scrapings. Cupp, 412 U.S. at 294. In contrast, Jones was lawfully in police custody pursuant to a valid arrest warrant. Given the existence of probable cause, the very limited intrusion to Jones' privacy interest, and the ready destructibility of the evidence sought, the GSR test was a reasonable search under the Fourth Amendment. The district court did not err in admitting it into evidence at trial.

IV

Jones' remaining claims can be addressed summarily. Jones challenges the decision of the district court allowing government witness Winzell Hinton to give opinion testimony as to coded conversations in which he was not a participant. Because Hinton's testimony was rationally based on his perceptions and helpful to the determination of a fact in issue, see Fed. R. Evid. 701, the district court did not abuse its discretion by admitting it. See United States v. Fowler, 932 F.2d 306, 312 (4th Cir. 1991).

Jones also contends that the district court erred by refusing to permit him to dismiss his counsel during trial and to conduct his own closing argument. In denying Jones' request, the district court cited the continuity of the proceedings, the possible confusion of the jury, the risk of a mistrial, and the competence of Jones' counsel. In light of these considerations, the district court did not abuse its discretion in refusing to allow Jones to conduct his own closing argument. See United States v. Dunlap, 577 F.2d 867, 869 (4th Cir. 1978).

Jones finally contends that the district court violated 18 U.S.C. § 3432 by allowing government witness Kenneth Fuller to testify at trial. Although Fuller's name was not on the witness list that the government produced a week before the trial began, his indictment and plea agreement were included in the Jencks and Giglio material that the government turned over at the same time. The government also included Fuller on a witness list used during voir dire of prospective jurors, which began on April 6, 1998. Opening arguments and testimony began in the case on April 16, 1998. Because Jones did not allege any particular prejudice suffered due to a possible technical violation of § 3432, the district court did not err by allowing Fuller

7

to testify at trial. <u>See United States v. Tipton</u>, 90 F.3d 861, 889 (4th Cir. 1996) ("[A] defendant claiming a violation of the right to access that § 3432 is designed to protect must show actual prejudice from any impairment or interference with the right.").

Finding no reversible error in the proceedings below, we affirm Jones' conviction.

<u>AFFIRMED</u>