OPINION
{¶ 1} The defendant-appellant, Alphonso King, appeals from the judgment of the trial court finding him guilty and sentencing him to a combined seven-year prison term on one count of aggravated vehicular homicide and one count of vehicular homicide, violations of R.C.2903.06(A)(1) and R.C. 2903.06(A)(3), respectively. The convictions were the product of a jury trial that also resulted in King being found not guilty of a second count of aggravated vehicular homicide. In his five assignments of error, he challenges (1) the weight and sufficiency of the evidence to support his convictions; (2) the admission into evidence of test results from blood samples taken from him after the automobile accident that gave rise to the charges; and (3) the permitting of testimony from the victim's wife concerning the emotional and financial impact of the loss of her husband. For the following reasons, we find no merit in any of the assignments of error and thus affirm.
 FACTS {¶ 2} The accident occurred on Columbia Parkway on a wet November 2000 morning. King and his friend, Leroy Goodrum, had been at a nightclub called Annie's and were traveling westbound in the outermost lane at approximately 3:00 a.m. The speed limit was forty-five miles per hour. According to the state's experts, King was driving his Q-45 Infiniti automobile at seventy-five miles per hour when he lost control of his vehicle. The Infiniti crossed the center lane, struck the guardrail twice, and then crashed into a Nissan Sentra that was traveling in the eastbound lane at approximately thirty-eight miles per hour. The driver of the Sentra, Sammy Wolfe, died from his injuries later that night at University Hospital. King, who suffered a fractured skull and broken bones in his jaw, hip, and ribs, was first treated at University Hospital before being transferred to Drake Hospital for a prolonged period of rehabilitation.
 {¶ 3} Cincinnati Police Officer Charles Beebe, an accident investigator, arrived at the scene of the accident at approximately 4:05 a.m. Beebe testified (at the trial, but not at the suppression hearing[1]) that he could smell the odor of alcohol on King before he was transported away by ambulance. Beebe communicated this information to Officer Paul Grein, who attempted to have the paramedics on the scene draw blood from King. The paramedics refused, however, because of King's critical status. Beebe therefore dispatched Police Specialist Greg Kaufman to University Hospital to obtain a sample of King's blood.
 {¶ 4} Kaufman arrived at the hospital at approximately 4:30 a.m. and found King lying on a gurney, attended by medical personnel. Kaufman, who did not have a warrant, waited and observed. Kaufman testified that King was wearing a neck brace, with tubes extruding from either his mouth or nose, but that he was able, when asked by the nurse, to write down his telephone number. It was Kaufman's impression that King, despite his physical condition, was alert and his mental faculties were intact. The nurse who was attending to King, Jill Bowman, testified that King had received narcotic pain medication, Fentanyl, but that she still considered him fully oriented to time and place. According to Bowman, before taking King's blood, she performed a "Glas[g]ow Coma Test" and scored him at the highest number of the scale, meaning that she believed that King fully understood what was being said to him.
 {¶ 5} Kaufman testified at the suppression hearing that when he arrived at the hospital, his purpose was not to place King under arrest. However, after waiting for the physicians to leave, Kaufman read to King first his Miranda rights and then recited to him language from the ALS (administrative license suspension) form designed to inform citizens of the implied-consent law under R.C. 4511.191. The first sentence that Kaufman read to King from the ALS form stated, "You are now under arrest for operating a vehicle under the influence of alcohol, a drug of abuse, or both alcohol and a drug of abuse."
 {¶ 6} After reading additional language from the form, Kaufman asked King if he would consent to a blood sample being drawn. According to Kaufman, King responded with an unintelligible grunt. Kaufman testified that he asked for King's consent a second time, and that again King grunted unintelligibly. Kaufman's impression was that King was being deliberately obtuse. Bowman then interceded, asking the question herself, and King, according to both Kaufman and Bowman, responded by clearly articulating his approval. Kaufman testified that he did not ask King to sign the form, which provided a space for that purpose, because King's arms were by that time strapped to the gurney.
 {¶ 7} The blood sample was drawn at approximately 5:00 a.m. After analysis the blood-alcohol content of the sample was shown to be .10 percent grams of alcohol per one hundred milliliters of blood, or right at the minimum prohibited level. The chief toxicologist for the Hamilton County Coroner's Office, Dr. Robert Powers, testified that alcohol dissipates from the blood at a rate of .02 percent per hour. He also testified that the "outside window" of the margin for error for the testing was five percent, but that his office's quality control reduced the margin to "actually two percent or under." A separate blood sample taken by hospital personnel as part of King's medical treatment after the accident was analyzed by a toxicologist from the Health Alliance Laboratory, who found a blood-alcohol level of .10 to .104 grams of alcohol per one hundred milliliters of blood.
 {¶ 8} King was arrested eighteen days later and charged with two counts of aggravated vehicular homicide. King did not testify during his trial. His friend Goodrum testified that King did not appear intoxicated when they left Annie's together, and that he remembered the sensation of King's Infiniti hitting a wet spot before the vehicle spun out of control. (Goodrum was later knocked unconscious when the car struck the guardrail.) King also produced testimony from Cincinnati Police Officer Ryan Hudson that Columbia Parkway was prone to overflow during heavy rains, and that the police had, on a number of occasions in the past, shut down the exact area where the accident occurred due to hazardous water conditions. Another friend of King's, Verdial Lewis, who was driving in a separate vehicle ahead of the Infiniti, testified that the "traction control" light of his vehicle had earlier become illuminated over the same patch of roadway where King's vehicle spun out. Lewis also testified that King could not possibly have been driving seventy-five miles per hour, as he himself had slowed down after spotting a police car on the berm shortly before encountering the wet spot, and that the Infiniti had not appeared to gain ground. Another friend of King's, Demetrias Cromwell, was driving a third vehicle, this one behind King, and he estimated King's speed at between 55 and 60 miles per hour. Cromwell also denied that King had given any appearance of being intoxicated before leaving Annie's. Finally, a traffic-accident reconstructionist hired by the defense testified that he had calculated King's speed at between 61 and 64 miles per hour, and also noted that the oversized tires on the Infiniti would have caused its speedometer to report a speed of five miles slower than the actual speed.
 {¶ 9} In addition to the testimony that King was under the influence, the state presented the testimony of Beebe, as an accident reconstruction expert, that the "critical speed" for the roadway that morning was 74 miles per hour, and that, according to his calculations, King must have been going at least 75 miles per hour to have caused the accident. Such a speed, Beebe stated, was clearly unreasonable given the conditions. The state also presented the testimony of Wolfe's widow, Mary Beth Wolf, who stated that she and their young son would have been in the car with her husband had she not contracted an ear infection. Mary Beth Wolfe was further allowed to testify how the loss of her husband had affected her, how his death had meant the loss of his income, and how the couple had had no life insurance policy.
 SUFFICIENCY AND WEIGHT OF THE EVIDENCE {¶ 10} In his first and second assignments of error, King challenges the weight and sufficiency of the evidence to support his convictions. As noted, King was found guilty of one count of aggravated vehicular homicide (causing the death of another as the proximate result of violating R.C. 4511.19, which proscribes driving while under the influence) and one count of simple vehicular homicide (causing the death of another by driving negligently). See R.C. 2903.06(A)(1) and (A)(3).
 {¶ 11} The issues of weight and sufficiency involve two separate tests on review. Sufficiency is essentially a test of adequacy and asks not whether the state's evidence is to be believed, but, if it is believed, whether it is sufficient to support a conviction. See Statev. Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541
(Cook, J., concurring). In contrast, a weight-of-the-evidence review requires that the appellate court enter the jury box, sitting as a "thirteenth juror" and asking itself if the other members of the panel have either lost their way or created such a manifest miscarriage of justice that their verdict must be reversed and a new trial ordered. Id. at 387, 678 N.E.2d 541. The discretionary power to grant a new trial, however, may only be exercised in the exceptional case in which the evidence weighs heavily against a conviction. Id.
 {¶ 12} King argues that the blood samples taken from him were insufficient to establish a violation of R.C. 4511.19(A), given the margin of error associated with the tests for blood-alcohol content. We disagree that the margin of error discussed by Dr. Powers (which was described by him as actually two percent or lower) rendered the test results unreliable as a matter of law. As noted, the test for sufficiency requires that we give the state the benefit of all reasonable inferences from its evidence, and so we cannot assume that these particular test results were affected by error. The evidence of the rate of dissipation and the timing of the sample also supports an inference that the results would have been higher had the sample been taken sooner. Significantly, the other test results showed a range of alcohol content between .10 to .104 milligrams of alcohol per one hundred millimeters of blood. There was also testimonial evidence to support the inference that King was intoxicated — that of Beebe and Kaufman that they smelled the odor of alcohol on his person directly after the accident and in the hospital. Considering all these factors, we hold that the state presented sufficient evidence to get the case to the jury on whether King was driving while intoxicated.
 {¶ 13} King's argues that his convictions were contrary to the manifest weight of the evidence in view of the testimony of Goodrum, Lewis, and Cromwell that he did not appear intoxicated and that he was not speeding on Columbia Parkway. In King's reckoning, their testimony should have been accorded greater weight than the blood-sample evidence, the testimony of Beebe and Kaufman that he smelled of alcohol, and Beebe's testimony, as an expert on accident reconstruction, that the Infiniti had to have hit the wet spot at 75 miles per hour to have spun so wildly out of control. It is well settled, however, that the credibility of witnesses is a determination uniquely within the province of the jury, which has had the opportunity to observe their demeanor and make uniquely human assessments of their trustworthiness. As pointed out in Thompkins, to speak of the weight of the evidence is not to describe a mathematical formulation, but, rather, to examine the effect of the evidence in inducing belief. Id. at 387, 678 N.E.2d 541.
 {¶ 14} Here the jury, after listening to the testimony of Goodrum, Lewis, and Cromwell, obviously chose not to believe their testimony that King was not intoxicated after a night out at a bar with these same three friends, when the medical tests indicated otherwise, or that King was observing the speed limit when he caused the accident that killed Wolfe, when the state's expert testified to the contrary that the accident required a speed of 75 miles per hour. Although there was certainly evidence on either side in this case, we cannot say, even sitting as a thirteenth juror, that the jury lost its way or committed a miscarriage of justice in convicting King, or that this is the exceptional case in which the evidence weighed heavily against a conviction.
 {¶ 15} King's first and second assignments of error are, accordingly, overruled.
 MOTION TO SUPPRESS {¶ 16} In his third assignment of error, King argues that "it is clear" that he did not consent to have his blood drawn in the hospital. In this regard, he focuses on Kaufman's testimony that he grunted his responses, arguing that his grunting was not a "clear, unambiguous consent to draw blood." He argues further that the blood tests should have been suppressed even if it is assumed that he did give his consent, because Ohio's implied-consent law requires the suspect to be placed under arrest in order for any consent to be valid. The state on the other hand, argues that in this case King gave his actual, not implied, consent to the taking of a blood sample, and therefore this is not a case implicating Ohio's implied-consent law.
 {¶ 17} We address first the threshold factual issue whether King actually indicated his consent to have the police draw a blood sample. King's argument that he did not — that he merely grunted indecipherable responses — ignores entirely the testimony that he verbalized a positive response after Nurse Bowman interceded and asked for his consent. Both Kaufman and Bowman testified that King did, in fact, verbally give his permission. In overruling King's motion to suppress, the trial court emphasized Bowman's testimony that King consented when she asked for his permission take his blood sample, as well as her testimony that King was "oriented to time, place and situation." Because the trial court's finding of a verbalized consent was supported by competent, credible evidence, and no clear error appears in its statements of historical fact, we are bound to accept its findings.Ornelas v. United States (1996), 517 U.S. 690, 699, 116 S.Ct. 1657; Statev. Curry (1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172.
 {¶ 18} We must now independently determine, as a matter of law, and without deference to the trial court's conclusions, whether King's verbalization of his consent to the search was sufficient to justify the taking of his blood. Id. As noted, King contends that his consent, even if verbalized, was invalid under Ohio's implied-consent law because Kaufman had not placed him under arrest. This assertion is based upon Kaufman's testimony, at the suppression hearing, that his purpose at the hospital that morning was not to place King under arrest. As we have also noted, however, the first line of the ALS form that Kaufman then read to King informed him that that he was "now under arrest."
 {¶ 19} R.C. 4511.191(A) provides that a person operating a vehicle in Ohio on "a highway or any public or private property used by the public for vehicular travel or parking" is deemed to have given consent for the administration of chemical tests to determine a level of alcohol consumption or drug use. The same statutory section makes clear that the police can only use such implied consent after the person has been arrested for driving under the influence. Id. The legislative purpose is to make refusals to take such tests after a lawful arrest a basis for administrative license suspension. The law is not intended to give police the authority to stop people and administer chemical tests before making an arrest based on probable cause. See, generally, Painter, Ohio Driving Under the Influence Law (2003 Ed.), 8.1-8.21.
 {¶ 20} Given the importance of an arrest for DUI in triggering the statutorily implied consent, an entire body of case law has arisen on the arrest requirement under R.C. 4911.191(A). Generally, four elements must coalesce in order for their to be an arrest under Ohio law: (1) an intent to arrest, (2) under real or pretended authority, (3) accompanied by some form of actual or constructive seizure or detention, (4) so that the person understands that he or she is not free to leave. State v. Darrah
(1980), 64 Ohio St.2d 22, 26, 412 N.E.2d 1328. In this case, the trial court made no factual or historical findings on this issue of an arrest. Although King was obviously not going anywhere with a fractured skull and broken jaw, hip, and ribs, not to mention the fact that he was intubated and sedated, it is unclear whether Kaufman would have allowed King, had he been able, to get up and walk away.
 {¶ 21} Courts are divided on whether the mere rote recitation of language on the ALS form to a suspect, informing him that he is under arrest, is sufficient to imply an actual intent to arrest. Some courts have held that, in the absence of contradictory evidence, the rote recitation of the form is enough to manifest intent to arrest and to constitute a constructive seizure. See State v. Barr (Apr. 26, 1995), 9th Dist. No. 16822. Barr is not helpful here, however, because there is contrary evidence — Kaufman's statement that his purpose in going to the hospital was not to place King under arrest. Other courts, including this court, have held that a rote recitation of the ALS form is not sufficient of itself to constitute a valid arrest. State v Vickrey
(July 5, 1989), 1st Dist. No. C-880336.[2] A separate, valid arrest must actually precede the reading of the ALS form because the mere reading of the form is not enough to constitute an arrest to trigger the implied consent. See State v. Rice (1998), 129 Ohio App.3d 91, 97-99,717 N.E.2d 351(collecting cases).[3]
 {¶ 22} As noted, the state argues that the issue of whether there was an arrest, and therefore a triggering of the implied consent law, is simply irrelevant because in this case King gave his actual consent to the test. We agree with the proposition that actual, voluntary consent to a blood test to determine alcohol content obviates the need for the state to establish the prerequisites of R.C. 4511.191. See Fairfield v.Regner (1985), 23 Ohio App.3d 79, 85, 491 N.E.2d 333. Indeed, actual, voluntary consent by a citizen obviates the need for probable cause for any search. Still, the state's argument begs the question — was the consent King gave voluntary? As noted by the court in Regner, "`if under all the circumstances it has appeared that the consent was not given voluntarily — that it was coerced by threats or force, or granted only in submission to a claim of lawful authority [as advising a suspect of the consequences of failure to submit to a chemical test * * *] — then we have found the consent invalid and search unreasonable.'" Id. at 84-85, 491 N.E.2d 333, quoting and incorporatingSchneckloth v. Bustamone (1973), 412 U.S. 218, 233, 93 S.Ct. 2041.
 {¶ 23} Several courts have reversed convictions where the consent appeared to have been more in the nature of acquiescence or submission to authority after the suspect was erroneously read the ALS warning without, in fact, being under arrest. See, e.g., State v. Gottfried
(1993), 86 Ohio App.3d 106, 619 N.E.2d 1185; State v. Chard (Feb. 24, 1984), 6th Dist. No. L-83308; State v. Szalai (1983), 13 Ohio Misc.2d 6,468 N.E.2d 396; see, also Vickrey, supra. [4] In Regner, the court found that the defendant had voluntarily consented to a blood draw free from coercion or constraint In that case, however, the ALS form was not read to the suspect — the blood was drawn in the ambulance after Regner had been told that she was not under arrest, that she could refuse to allow a sample to be withdrawn, and that her consent must be voluntary, to which she responded, "You can do anything you want. You can take anything you want."
 {¶ 24} Here, King was told, pursuant to the language read to him from the ALS form, that he was under arrest and that he had to submit to the test or violate the law. Under such circumstances, it is difficult to imagine that the consent he gave was voluntary. Indeed, Kaufman's own testimony that King was playing games to avoid the questioning by grunting, would strongly indicate that he was not eager to volunteer his consent. We do note, however, that King did not testify at the suppression hearing, and therefore the record does not contain any testimony from him that he felt coerced into giving his consent after being read the ALS form. The burden is on the state, however, not King, to demonstrate a voluntary consent to a warrantless search. See Statev. Denune (1982), 82 Ohio App.3d 497, 612 N.E. 768.[5]
 {¶ 25} The state next argues, alternatively, that consent of any sort, actual, implied, or voluntary, was not legally necessary because the trial court found that the drawing of blood was justified under the evanescent-evidence exception established in Schmerber v. California
(1966), 364 U.S. 757, 86 S.Ct. 1826. See, also, Cupp v. Murphy (1973),412 U.S. 291, 93 S.Ct. 2000. In Schmerber, the petitioner challenged his conviction for driving while intoxicated upon the basis that the warrantless seizure of his blood, over his objection, violated his Fourth Amendment rights. Although rejecting his claim, the Supreme Court held that a warrantless search that intruded into the human body was not justifiable as a search incident to a lawful arrest. But the warrantless seizure could be justified, the Court held, based upon the evanescent nature of the evidence — the fact that the level of alcohol in blood decreased with the passage of time. Id. At 779, 86 S.Ct. 1826. Because of the fleeting nature of the evidence, the time necessary to obtain a warrant, and the prior of establishment of probable cause to justify an arrest, the Court upheld the warrantless seizure of the petitioner's blood as reasonable under the Fourth Amendment.[6]
 {¶ 26} Although there was an arrest in Schmerber, the Court did not make its holding dependent upon the fact that the defendant had been arrested, only that there was probable cause for the DUI arrest. (As noted, the seizure of blood was held not to be an incident of the arrest.) Consequently, as one state supreme court has recently noted, "there now appears to be universal agreement among the courts that have addressed the question that an arrest in not integral to the Schmerber
holding and, consequently, that a warrantless extraction of blood from a driver lawfully suspected of DUI, does not violate the [F]ourth [A]mendment even in the absence of an arrest or actual consent." Statev. Entrekin (2002), 98 Haw. 221, 230, 47 P.3d 336 (citing cases); see, also, State v. Murray (2001), 271 Kan. 223, 228-232, 21 P.3d 528 (citing cases). Schmerber is thus held to present only a three-prong test in order to determine whether blood alcohol evidence can be take from a suspect without consent and without a warrant: "1) there must be exigent circumstances in which the delay necessary to obtain a warrant would threaten the destruction of the evidence; (2) the officer must have probable cause to believe that the suspect has been driving under the influence of alcohol; and (3) the procedures used to extract the blood must be reasonable." Murray at 227, 21 P.3d 528.
 {¶ 27} Here, officers testified at the suppression hearing that there was not sufficient time to obtain a warrant for the blood sample. The blood sample was drawn by trained medical personnel using medically acceptable procedures. The determinative question becomes, then, whether the police had probable cause to suspect that King was guilty of driving while intoxicated before his blood was seized. As noted, Beebe, the officer at the scene who had the most contact with King, did not testify at the suppression hearing. Officer Grein testified, however, "Officer Beebe had told me he smelled alcohol on [King's] person." Although this was hearsay, such a statement is admissible at a suppression hearing and may be used to support a finding of probable cause. State v. Woodring
(1989), 63 Ohio App.3d 79, 577 N.E.2d 1157. Furthermore, Kaufman testified at the hearing that he had deliberately drawn near to King at the hospital to confirm the fact that he smelled of alcohol, a smell he described as that of "an alcoholic beverage, like a beer smell * * *." The accident, as we have described, occurred after King's vehicle spun wildly out of control in the early morning hours.
 {¶ 28} We hold that probable cause exists to arrest for driving while under the influence when in the early morning hours a vehicle clearly goes out of control, there is an accident, and the driver has the odor of alcoholic beverages on his breath.
 {¶ 29} Accordingly, regardless of the issues involving consent and the application of the Ohio implied-consent law, the seizure of King's blood by the police was justified under Schmerber given the evanescent nature of the evidence and given that the police had probable cause to arrest King for driving under the influence. As this court has previously noted, "Ohio's implied-consent statute does not create a right of refusal or expand on the constitutional rights of a person suspected of driving under the influence." State v. Carter (Nov. 5, 1999), 1st Dist Nos. C-980942, C-980943, and C-980944. Further, as we also noted inCarter, provided that there is no constitutional violation involved in the taking of a blood sample, compliance with the procedures set forth in R.C. 4511.191 is not a requirement for the admissibility of the blood test results. Even assuming there had been a statutory violation, unless the violation implicated King's constitutional rights under the Fourth and Fourteenth Amendment, the test results were not subject to the exclusionary rule. See Hilliard v. Elfrink (1996), 77 Ohio St.3d 155,672 N.E.2d 166; Painter, supra, at 11.47.
 {¶ 30} King's third assignment of error is overruled.
 VICTIM-IMPACT TESTIMONY {¶ 31} In his fourth assignment of error, King argues that the trial court erred by admitting into evidence the testimony of Wolfe's widow regarding the emotional and financial impact of her husband's death. Initially we note that King's trial attorney did not object to the specific testimony now challenged by King. Without an objection by defense counsel, the trial court was under no responsibility to suasponte strike the testimony. When counsel did object to such testimony, the objection was properly sustained and the testimony was stricken. Any error in failing to challenge the testimony when it was offered rests clearly with King's trial counsel and gives rise, if at all, to a claim of ineffective assistance of counsel, not a claim of evidentiary error by the trial court. The assignment of error is overruled.
 HEALTH ALLIANCE TEST RESULTS {¶ 32} In his fifth and final assignment of error, King claims that the trial court erred by admitting into evidence the results of the blood test conducted by the Health Alliance Laboratory. He claims that the actions of state employees at the hospital in securing the results constituted a "de facto" search by the police, implicating his rights under the Fourth and Fourteenth Amendments. We have previously held, however, that the state was entitled to a warrantless seizure of King's blood, so that even if we were to accept the premise of King's argument, we would have no basis to hold that his constitutional rights had been violated.
 {¶ 33} Accordingly, all five of King's assignments of error are overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
HILDEBRANDT, P.J., concurs.
PAINTER, J., concurs separately.
Painter, J. concurring.
 {¶ 34} Judge Gorman's analysis is flawless. We are, however, breaking new ground, at least in Ohio.
 {¶ 35} This is an unusual case. We have held that the driver's consent was not voluntary, because he was coerced, as a matter of law, by the reading of the ALS warnings. That is correct.
 {¶ 36} We next hold that absent consent, if the officers have probable cause to arrest — whether or not an actual arrest occurs — they may draw blood without a warrant, if exigent circumstances exist. This holding would not have been possible before the legislature removed the words "no test shall be given" from the implied-consent law — because the statute indicated that following the implied-consent formula was the only way to obtain a test. This language is now gone, allowing the result here.
 {¶ 37} We also hold that probable cause existed under the facts of this case: an accident, after 3:00 a.m., a vehicle out of control, and the driver smelling as if he had been drinking. The obviously erratic driving, coupled with the odor, is sufficient to constitute probable cause.
[1] As will be discussed infra with respect to the issues surrounding King's motion to suppress, Beebe was not among the officers called to testify at the suppression hearing.
[2] Since Kaufman also read King his Miranda rights in the hospital, it should also be pointed out that this court has rejected as well the proposition that merely informing a suspect of his Miranda rights is tantamount to an arrest. Vickrey, cited in the text, relying upon Statev. Barker (1972), 53 Ohio St.2d 135, 372 N.E.2d 1324.
[3] This court has rejected, without analysis or discussion, the proposition that "an arrest for driving under the influence is a pre[-]requisite for the administration of a breath test pursuant to R.C.4511.191." State v. Tonne (Sept. 24, 1999), 1st Dist. No. C-980710. InTonne, though, the suspect was "taken" by the police officers to the police station prior to the breath test being administered, so it was quite clear in that case that there had been a preceding arrest.
[4] In Vickrey, this court held that a mere recitation of the ALS form language, telling the suspect that she was under arrest when she was not, was insufficient to constitute an arrest and thus trigger the running of the time limitations for a speedy trial under R.C.2945.71(B)(2). Although concurring in this result, Judge Hildebrandt wrote separately to express his concern on an issue that was not raised in the appeal — whether the erroneous statement in the ALS form that Vickrey was under arrest vitiated her consent to the officer's taking her blood sample.
[5] The state's burden would appear to be only to show that the consent was voluntary and not necessarily knowing and intelligent, which is the standard reserved for waivers of due process trial rights. SeeRegner, cited in text, at 85, 491 N.E.2d 333. But see Vickrey, cited in the text (Hildebrandt, J. concurring separately) (consent to a blood test must be "understanding and intelligent"), and State v. Szalai (1983),13 Ohio Misc.2d 6, 468 N.E.2d 396, citing City of Lakewood v. Smith
(1965), 1 Ohio St.2d 128, 205 N.E. 388 (waiver must be understanding and intelligent). Even if the state need only show that the consent was voluntary, however, and not necessarily understanding and intelligent, the circumstances must still demonstrate that the consent was more than just an acquiescence or involuntary submission to authority.
[6] The Court has made clear that the procedure for the removal of bodily fluids and the retrieval of ingested evidence must be relatively harmless. The forced ingestion of an emetic in an attempt to retrieve two swallowed capsules was viewed by the Court as too intrusive in Rochinv. California (1952), 342 U.S. 165, 72 S.Ct. 205. In Briethaupt v.Abram (1957), 352 U.S. 432, 77 S.Ct. 408, however, the Court upheld the drawing of blood from an unconscious driver who was suspected of driving under the influence, observing that the withdrawal of blood by a trained professional was neither brutal nor offensive. After Schmerber andBriethaupt, when the blood sample is drawn by a medical professional in accordance with accepted medical practice, the manner of the search is reasonable for purposes of the Fourth Amendment.