

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00226-CR
### NO. 02-16-00227-CR
### NO. 02-16-00228-CR

THE STATE OF TEXAS                                                    STATE

V.

TERRI SANDERS                                                      APPELLEE

----------

## FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
TRIAL COURT NOS. 2015-0255M-CR, 2015-0256M-CR, 2015-0257M-CR

----------

## OPINION

----------

### I. INTRODUCTION

The State appeals from the trial court's order granting appellee Terri Sanders's motion to suppress. The State contends that the trial court erred by concluding that exigent circumstances did not exist at the time the arresting officer in this case ordered a warrantless blood draw of Sanders's blood and that thus the trial court erred by granting the suppression motion. Because we

conclude that under the totality of the circumstances the State failed to carry its burden that exigent circumstances existed at the time the arresting officer ordered Sanders's blood be drawn, we will affirm.

## II. BACKGROUND

Sanders was travelling on the wrong side of the road on the night of October 23, 2015, when she struck another vehicle head-on. The collision resulted in the deaths of two individuals and serious injury to another. The State charged Sanders with two counts of intoxication manslaughter and one count of intoxication assault. Later, Sanders filed a motion to suppress the results of a warrantless and involuntary blood draw that occurred after she was transported to the hospital from the accident scene.

State Trooper Rachel Russell testified at the suppression hearing. According to Russell, around 11:45 p.m. on October 23, 2015, she received a dispatch regarding a two-vehicle, head-on collision. Russell said that as she was en route, she learned that the accident involved fatalities. By Russell's account, it took her approximately twenty minutes to arrive at the scene of the accident—specifically, she averred that she arrived at 12:07 a.m. on October 24, 2015.

Russell recalled that when she arrived, a great number of emergency responders were already at the scene of the accident. She said that she thought "everybody else in the county was there before [she] was." Russell detailed that "[t]he fire departments, the first responders, two deputies, the game warden, [and] multiple emergency vehicles [were] parked everywhere" when she arrived.

2

In the video from her dashcam, which was admitted at the suppression hearing, Russell can be heard stating, "Of course, every Tom, Dick, and Harry [inaudible] got to be here" as her patrol vehicle approached the accident scene. By Russell's recollection, the accident scene was under control when she arrived and some of the officers and emergency personnel on scene were not doing "a whole lot at that time."

Russell said that her responsibility was to investigate the accident. Russell averred that shortly after her arrival, she made contact with Sanders. Russell said that Sanders had "a little bit of blood on her face" but that Sanders reported that "she felt okay." Russell averred that she later learned that Sanders had suffered broken bones in the accident. Russell said that upon contacting Sanders, she detected an odor of an alcoholic beverage coming from Sanders and that she had slurred speech and red, bloodshot eyes.

According to Russell, State Trooper Brandon Neff also arrived on scene shortly after she did. Russell said that she instructed Neff to perform field sobriety tests on Sanders and "if need be, to get a specimen from her." Russell said that after assigning Neff to determine Sanders's level of intoxication, she turned her focus to gathering more information about the accident and the fatalities involved. By Russell's account, Sanders was transported from the scene in an ambulance around 12:30 a.m., and Russell said Neff followed the ambulance to the hospital. Russell averred that it would have taken the

ambulance "[f]ive minutes" to reach the hospital from the accident scene, but she also said that her notes showed that Sanders arrived at the hospital at 1:00 a.m.

Russell averred that while she was investigating, a justice of the peace arrived on the scene. By Russell's account, this happened after Sanders had been taken away. Russell said that she did not discuss drawing Sanders's blood with the judge and that the judge was there to pronounce the death of the two decedents. She said that the judge pronounced the two deceased at 12:40 a.m. Regarding why she did not seek a warrant for Sanders's blood, Russell averred that she did not have the time nor the opportunity to seek obtaining a search warrant because she was investigating the scene. Furthermore, Russell averred that the decision to seek a warrant would have been "Trooper Neff's decision."

Russell said that Deputy Lee Phariss and the game warden, who were on the scene, were assisting her in "painting the scene" and filling out "a major crash packet." But in all, Russell averred that seven peace officers, including herself, were at the scene of the accident—one of them was Phariss. And even though Russell averred that no one accompanied Neff to the hospital, Russell can be heard on the video from Neff's dashcam stating that she was "sending Lee up there" to the hospital with Neff in case Sanders's boyfriend "g[a]ve [Neff] any problems." Russell also said that there were fourteen firefighters at the accident scene. Video from Russell's dashcam shows that the entire scene had been cleared and that most of the emergency personnel who had responded, as well

4

as their emergency vehicles, had left the scene within two hours of Russell's arrival.

Trooper Neff testified at the hearing as well. Neff averred that because Russell was the lead investigating officer at the time he arrived on the scene, he was there to assist Russell. Neff said that his assistance revolved around speaking with Sanders and that he did not have any accident scene duties. By Neff's account, Sanders appeared confused and did not "have much recollection of the crash." Neff said that even though he had already been advised by Russell to perform field sobriety tests on Sanders, he too suspected she was intoxicated through his own observations because he could smell an odor of an alcoholic beverage emitting from Sanders. He also averred that Sanders had "glassy, blood-shot eyes" and slurred speech. Sanders also told Neff that she had consumed alcoholic beverages earlier in the day.

Neff said that he asked Sanders whether she was injured, that Sanders replied she was not, and that Sanders had refused medical attention. Neff also said that he did not detect any injuries to Sanders and that he did not know until later that she had suffered a broken ankle.

According to Neff, Sanders was not steady on her feet and leaned on multiple vehicles as he asked her to walk over to a patrol vehicle, where he intended to initiate field sobriety tests. Neff said that Sanders was "very compliant" and that after he explained to her the tests and then began to conduct the horizontal gaze nystagmus test, Sanders's boyfriend "stopped [Neff] and told

[him] that he wanted her to be reevaluated again by the medics." Neff said that he believed that Sanders's boyfriend stopped the tests to prevent them from being conducted and not out of a concern for Sanders's well-being.

Video submitted from Neff's dashcam shows that medical personnel took several minutes from that time to strap Sanders to a stretcher and then lift her onto a gurney and into an ambulance. Also from the video, while medical personnel attended to Sanders, a conversation can be seen and heard between Neff and Russell. In that conversation, Russell can be heard telling Neff that she would be sending "Lee" with him to the hospital in case Sanders's boyfriend gave Neff any "problems." And Neff can be heard stating, "But we're going to take her blood anyway, so it doesn't matter."

Neff said that it only took five minutes for the ambulance to transport Sanders to the nearby hospital and that he followed the ambulance in his patrol vehicle. Neff said that upon arriving, because he believed that the boyfriend was attempting to interfere with his investigation, he spoke with Sanders's boyfriend outside the hospital. Neff said that the boyfriend became "very compliant at that time and said that he would let [Neff] do [his] job." Neff initially testified that he believed he arrived at the hospital around 12:30 a.m.

Neff said that he escorted Sanders to the examination room, read Sanders the standard blood draw warnings, and asked her for a consensual blood sample but that Sanders refused. Neff averred that at this time, medical personnel began to "put up the pole and [bring in] fluid bags" and that he became

6

concerned about obtaining a blood sample because Sanders had begun to complain about pain. Neff said that he did not know the nature of what medical personnel were about to perform but said that he felt like he needed to obtain a blood sample prior to what they were doing because he felt that whatever they were about to do would result in a "lower or less accurate" blood sample and so he ordered that one be drawn. Neff's authorization ordering hospital personnel to draw Sanders's blood, which was admitted before the trial court, indicates that the blood draw was ordered at 1:24 a.m. on October 24, 2015.

Neff said that it was his understanding that the justice of the peace who was at the accident scene arrived on the scene after he had left. He also said that he had search warrant forms on his person in the examination room. But Neff said that he did not have time to fill out the forms prior to medical personnel pushing him "out of the way." Neff averred that there was no one else available to assist him with Sanders and that he felt that he was acting under exigent circumstances. Neff further averred that because there had been a fatality in the accident, he believed that he did not need a warrant to draw Sanders's blood. Neff's authorization ordering the blood draw indicates that the order to draw blood was predicated on an "[a]ccident with death, serious bodily injury, or hospital treatment for bodily injury."

On cross-examination, Neff agreed that according to a nurse's notes, he arrived at the hospital at 1:05 a.m. and that he had time to conduct the horizontal gaze nystagmus test prior to reading Sanders the warnings and ordering the

7

blood draw. Neff also acknowledged that he had stated at the scene of the accident, prior to leaving for the hospital, that he intended to draw Sanders's blood, and he also agreed that he had taken no steps toward securing a warrant at any time.

The trial court granted Sanders's suppression motion and later entered findings of fact and conclusions of law. In its findings, the trial court found that Neff had arrived at the accident scene shortly after 12:07 a.m. and that Sanders was transported to the hospital, arriving "at about 1:00 a.m." The trial court also found that, even though Neff had testified that his training had made him concerned that the injection of saline and the use of alcohol wipes in drawing blood would interfere with an accurate analysis of blood alcohol content, no testimony was offered about the nature of the fluids that Neff believed were about to be injected prior to him ordering the blood draw. The trial court further found that despite Neff having warrant forms in his possession, he did not attempt to begin to obtain a warrant, locate a magistrate, nor contact another officer to assist him in obtaining a warrant.

In its conclusions of law, the trial court concluded that Neff had probable cause to obtain Sanders's blood because of her apparent cause of a fatal vehicle collision and because she exhibited signs that she had consumed alcohol prior to the accident. The trial court also concluded that a magistrate was "approximately five minutes away from the hospital to which [Sanders] was taken for approximately 45 minutes before [her] blood was drawn." The trial court further

8

concluded that the State had produced no evidence as to the nature of the medical treatment Sanders was about to receive prior to the blood draw and how it would result in destruction of evidence. And the trial court ultimately concluded that the State had failed to carry its burden that Neff's warrantless order to draw Sanders's blood was done under exigent circumstances. This interlocutory appeal followed.

### III. DISCUSSION

In its sole point—including a series of points and subpoints—the State makes one overall argument on appeal: That given the totality of the circumstances, including "the degradation of alcohol evidence[,] . . . the severity of the accident, the lack of additional officer availability, the unknown location of the magistrate, and the imminent unknown medical intervention by hospital staff, [Neff] believed the blood test's efficacy would be significantly undermined" by medical intervention and thus constituted exigent circumstances supporting Neff's decision to order a warrantless blood draw.

Sanders counters with the argument that the record establishes that Neff did not attempt to obtain a warrant, based on his mistaken belief that a warrantless blood draw was authorized by statute, and that the record establishes that additional officers were available to obtain a warrant that was readily available. Thus, the trial court did not err by concluding that no exigent circumstances existed and granting her suppression motion.

9

### A. Standard of Review

In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determination of historical facts that depend on credibility, while we conduct a de novo review of the trial court's application of the law to those facts. *Id.* In a hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). This is so because it is the trial court that observes firsthand the demeanor and appearance of a witness, as opposed to an appellate court, which can only read an impersonal record. *Id.* Thus, with regard to those facts that the trial court explicitly found, we defer to those explicit findings so long as they are supported by the record. *State v. Gray*, 158 S.W.3d 465, 467 (Tex. Crim. App. 2005). With regard to remaining facts not explicitly found by the trial court, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supporting its ruling so long as those findings are supported by the record. *Ross*, 32 S.W.3d at 855; *see also Tran v. State*, No. 01-11-00141-CR, 2012 WL 3133925, at *3 (Tex. App.—Houston [1st Dist.] Aug. 2, 2012, pet. ref'd) (applying light-most-favorable standard to record and assuming implicit findings to support suppression ruling even though trial court entered explicit findings of facts) (mem. op., not designated for publication). We must sustain the

10

trial court's ruling if it is correct under any theory of law applicable to the case. *Ross*, 32 S.W.3d at 855–56.

## B. The Fourth Amendment and Bodily Intrusions

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A warrantless search of a person is reasonable only if it falls within a recognized exception. *State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App. 2014), *cert. denied*, 136 S. Ct. 2544 (2016). Bodily intrusions implicate an individual's "most personal and deep-rooted expectations of privacy," and therefore they are considered searches that fall under the Fourth Amendment's warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148, 133 S. Ct. 1552, 1558 (2013) (*quoting Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 1616 (1985)). There are several exceptions to the warrant requirement, but the instant case involves only one—a warrantless search performed to prevent imminent evidence destruction, or the so-called "exigency exception." *See Cupp v. Murphy*, 412 U.S. 291, 296, 93 S. Ct. 2000, 2004 (1973); *see also Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856–57 (2011).

## C. Exigency and Warrantless Blood Draws

The exigency exception operates "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is

11

objectively reasonable under the Fourth Amendment." *McNeely*, 569 U.S. at 148–49, 133 S. Ct. at 1558 (quoting *King*, 563 U.S. at 460, 131 S. Ct. at 1856). Exigency potentially provides for a reasonable, yet warrantless search "because 'there is compelling need for official action and no time to secure a warrant.'" *McNeely*, 569 U.S. at 149, 133 S. Ct. at 1559 (*quoting Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978)). Whether law enforcement faced an emergency that justified acting without a warrant calls for a case-by-case determination based on the totality of the circumstances. *McNeely* 569 U.S. at 149, 133 S. Ct. at 1559. "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2413 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S. Ct 1868, 1882 (1968)). An exigency analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search. *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948 (2006).

"The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a 'now or never' situation." *McNeely*, 569 U.S. at 153, 133 S. Ct. at 1561. The body's natural metabolism of intoxicating substances is distinguishable from the potential destruction of easily disposable evidence when the police knock on the door. *Cf. King*, 563 U.S. at 459–60, 131 S. Ct. at 1856 (recognizing the warrant requirement exception to prevent the imminent destruction of evidence when law

enforcement, after knocking on a suspect's door, believed drugs were being destroyed).

### D. *Schmerber, McNeely, Cole, and Weems*

In Texas, exigent-circumstances cases involving a warrantless blood draw are controlled by both the United States Supreme Court's precedent from *Schmerber v. California* and *Missouri v. McNeely* as well as the Texas Court of Criminal Appeals's decisions in *Cole v. State* and *Weems v. State*. *Schmerber v. California*, 384 U.S. 757, 770–72, 86 S. Ct. 1826, 1835–36 (1966); *McNeely*, 569 U.S. at 149–50, 133 S. Ct. at 1559; *Cole v. State*, 490 S.W.3d 918, 923 & n.24 (Tex. Crim. App. 2016); *Weems v. State*, 493 S.W.3d 574, 578 (Tex. Crim. App. 2016). In a case like this, a discussion of these cases is warranted.

### 1. *Schmerber v. California*

In *Schmerber*, the Supreme Court held that based on the circumstances surrounding the search, a warrantless seizure of a driver's blood was reasonable. 384 U.S. at 770–72, 86 S. Ct. at 1835–36. Schmerber and his companion were injured and taken to a hospital after Schmerber's car skidded, crossed the road, and struck a tree. *Id.* at 758 n.2, 86 S. Ct. at 1829 n.2. While Schmerber was at the hospital, a police officer directed a physician to take a sample of his blood. *Id.* at 758, 86 S. Ct. at 1829. Later testing indicated that Schmerber was intoxicated at the time he lost control of his car. *Id.* at 759, 86 S. Ct. at 1829. Although a bodily intrusion calls for the same individual protections that the warrant requirement provides for the search of a home and the seizure of one's

13

papers, the *Schmerber* Court reasoned that the seizing officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770, 86 S. Ct. at 1835–36 (internal quotations omitted).

Adopting a totality-of-circumstances approach, the *Schmerber* Court held that the circumstances surrounding the blood draw rendered the warrantless search reasonable because (1) the officer had probable cause that Schmerber operated a vehicle while intoxicated; (2) alcohol in the body naturally dissipates after drinking stops; (3) there was a lack of time to procure a warrant because of the time it took to transport Schmerber to a hospital and investigate the accident scene; (4) there are highly effective means of determining whether an individual is intoxicated; (5) venipuncture is a common procedure and usually "involves virtually no risk, trauma, or pain"; and (6) the venipuncture was performed in a reasonable manner. *Id.* at 768–72, 86 S. Ct. at 1834–36.

### 2. *Missouri v. McNeely*

Nearly fifty years after its 1966 *Schmerber* decision, in 2013, the Supreme Court held in *McNeely* that the natural dissipation of alcohol in the bloodstream does not create a per se exigency justifying an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing. 569 U.S. at 165, 133 S. Ct. at 1568. The *McNeely* Court held firm to the warrant requirement by stating that "where police officers can reasonably obtain a warrant before a

14

blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 152, 133 S. Ct. at 1561. Yet the Court still recognized the gravity of the body's natural metabolic process and the attendant evidence destruction over time. As the *McNeely* Court stated, "It suffices to say that the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id.* at 165, 133 S. Ct. at 1568. With this balance in mind, the *McNeely* Court, adhering to a totality-of-the-circumstances analysis, rejected a per se rule while also acknowledging that certain circumstances may permit a warrantless search of a suspect's blood. *Id.* Admittedly, the narrow issue before the *McNeely* Court prohibited it from providing an exhaustive analysis of when exigency in intoxication-related offenses may be found. *Id.* But the *McNeely* Court did provide insight on the issue by identifying a few relevant circumstances that may establish exigency in this context. In addition to the body's metabolization, relevant circumstances include "the procedures in place for obtaining a warrant," "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *Id.* at 164, 133 S. Ct. at 1568.

3. ***Cole v. State* and *Weems v. State***

Following *McNeely*, in 2016 the court of criminal appeals handed down two decisions on the same day that bookend the question of when exigent

15

circumstances allow for a warrantless blood draw and when they do not. *Cole*, 490 S.W.3d at 921; *Weems*, 493 S.W.3d at 578.

Practical constraints posed by a severe accident and the attendant duties that demand that officers are not free to investigate probable cause and pursue a warrant can justify a warrantless blood draw. *Cole*, 490 S.W.3d at 927. In *Cole*, Cole's large pickup truck, which was traveling at 110 miles per hour through a busy downtown intersection, struck another pickup, causing an explosion. *Id.* at 919–20. This collision engulfed the other pickup in flames and killed the other driver. *Id.* Police arrived to a calamitous scene with multiple fires and continued explosions, requiring numerous officers to keep people away from the scene for their safety. The danger required extensive manpower to block off several major intersections around the area. *Id.* Complicating things further, the collision occurred at the same time as a shift change, when some officers were leaving their evening shifts and others arriving for their late-night shifts—cleanup of the accident took nearly eight hours. Cole was transported to the hospital, where the transporting officer ordered hospital staff to draw Cole's blood. *Id.* at 921.

Prior to trial, Cole moved to suppress the results of the blood draw. *Id.* At the suppression hearing, the investigating officer testified that he could not afford to assign an officer away from the scene to obtain a warrant without neglecting an essential duty to secure the scene safely, that the process of obtaining a warrant would have taken an hour to an hour-and-a-half, and that it was not

16

feasible to wait until the accident investigation was entirely completed before securing a warrant. *Id.*

The *Cole* court reasoned that the most significant obstacle to officers obtaining a warrant was the amount of time it took for the investigating officer to investigate the scene. *Id.* at 925. The *Cole* court further reasoned that the time required to complete the accident investigation, the inability of investigators to focus on and form probable cause, and the lack of available law enforcement personnel further hindered pursuing a warrant. *Id.* Notably, and although the *Cole* court rejected a blanket rule requiring the State to demonstrate that no other officer was available to obtain a warrant in every case, it noted that "the availability of other officers is a relevant consideration in an exigency analysis." *Id.* at 926. The *Cole* court held that under the totality of the circumstances, "law enforcement reasonably believed that obtaining a warrant . . . would have significantly undermined the efficacy of searching Cole's blood." *Id.* at 927. Thus, the *Cole* court held "that exigent circumstances justified Cole's warrantless blood draw." *Id.* at 927.

In contrast to a case like *Cole*, the State fails to meet its burden to establish that exigent circumstances existed at the time of a warrantless blood draw whenever the record indicates that probable cause was present at the time of the draw, that an officer who was not preoccupied in investigating an accident was available to pursue a warrant, and when the record is devoid of what procedures and how much time procuring a warrant would have required.

17

*Weems*, 493 S.W.3d at 580–82. In *Weems*, Weems was involved in a one-car accident wherein his car had veered off the road, flipped over, and hit a utility pole. *Id.* at 575. A nearby witness saw Weems crawl out of the vehicle, heard him admit he was drunk, and then saw him flee the scene. *Id.* The responding officer found Weems hiding under a nearby parked car nearly forty minutes after the accident. *Id.* at 575–76, 581.

At the suppression hearing, the arresting officer testified that when he took custody of Weems, Weems had bloodshot eyes, slurred speech, a bloodied face, an inability to stand, and a strong smell of alcohol on his breath. *Id.* at 576. Believing Weems had sustained injuries in the accident, the officer did not conduct field sobriety tests. *Id.* Nonetheless, based upon his observations, the officer arrested Weems on suspicion of driving while intoxicated. *Id.* Weems refused to give a breath or blood sample, and emergency personnel treated Weems at the arrest location and then transported him to the hospital for further treatment. *Id.* The arresting officer followed the ambulance to the hospital, which took only a couple of minutes. *Id.* While there, the officer filled out a form for the hospital to draw Weems's blood. *Id.* Because the hospital was busy that evening, Weems's blood was not drawn until about two hours after he was arrested. *Id.*

In arriving at its holding that exigent circumstances did not exist, the *Weems* court noted that the record was devoid of any evidence reflecting "what procedures, if any, existed for obtaining a warrant when an arrestee is taken to

18

the hospital or whether [the arresting officer] could have reasonably obtained a warrant, and if so, how long that process would have taken." *Id.* at 581. The *Weems* court further noted that even though the record did not definitively establish that a magistrate was available at the time Weems's blood was drawn, the arresting officer's testimony suggested that a magistrate was normally available. *Id.* at 581–82.

The *Weems* court reasoned that because transporting Weems to a nearby hospital did not "necessarily make obtaining a warrant impractical [n]or unduly delay the taking of Weems's blood to the extent that natural dissipation would significantly undermine a blood test's efficacy," and because other officers were available to investigate the scene of the accident and escort Weems to the hospital, the record "militate[d] against a finding that practical problems prevented the State from obtaining a warrant within a time frame that preserved the opportunity to obtain reliable evidence." *Id.* at 582. Despite Weems having contributed to the delay in obtaining evidence of his blood alcohol content by secreting himself away for forty minutes, the *Weems* court held that the State had failed to meet its burden to establish that exigent circumstances existed. *Id.*

### 4. Neff Should Have Procured a Warrant

The State argues that this case is similar to *Cole* and that this court should overrule the trial court. *See Cole*, 490 S.W.3d at 921. But unlike in *Cole*, where the investigating officer testified that he could not afford to assign an officer away from the scene, here not only did Russell—the investigating officer—declare that

19

there were numerous officers and emergency personnel available, she specifically testified that some of the officers were not doing "a whole lot" when she arrived. This position is buttressed by her testimony that nearly everyone in the county was there when she arrived and by her declaration heard on the video from her dashcam as she arrived on the scene that "[o]f course, every Tom, Dick, and Harry [inaudible] got to be here." Furthermore, Russell can be heard stating to Neff that she would send "Lee" with him to the hospital to assist him with Sanders and her boyfriend, and Russell testified that Deputy Lee Phariss was at the accident scene. Neff's response to this was that it didn't matter that Lee was available because he would be obtaining a blood sample anyway. The reasonable inference from this evidence is that an officer was available to assist Neff in procuring a warrant but that Neff declined the officer's assistance because he believed, as he testified, that he could obtain a blood sample without a warrant because the collision had involved fatalities. The availability of an officer to assist Neff is significant. As the *Cole* court made clear, "the availability of other officers is a relevant consideration in an exigency analysis." *Id.* at 926. Here Russell was the lead investigator, Neff was assigned in her stead to investigate Sanders's intoxication, and he was offered the assistance of another officer. It is relevant that other officers were available to assist Neff, and this record—and the reasonable inferences from the record—show that Neff had more than enough assistance to seek a warrant but that he simply chose not to do so. *See id.*

Also unlike in *Cole*, where the *Cole* court reasoned that the investigators were unable to focus on forming probable cause given their involvement in securing the accident scene, here Russell informed Neff upon his arrival that she believed Sanders was intoxicated, and Neff testified that Sanders, who had been involved in a collision that she had caused resulting in fatalities, exhibited slurred speech, red and bloodshot eyes, imbalance in her walking, and a smell of an alcoholic beverage. And Sanders had admitted to having imbibed alcoholic drinks earlier in the day.

Furthermore, unlike in *Cole*, where there was testimony that the process of obtaining a warrant would have taken up to an hour-and-a-half after the completion of the investigation, here there is no evidence of what time constraints or what procedures would have been involved had Neff sought to obtain a warrant. But the evidence fully supports that a magistrate was at the scene of the accident, five minutes away, at the time when Neff was at the hospital with Sanders more than an hour after Neff had first encountered her.

Far from there being evidence in this record that would have led Neff to believe that seeking a warrant would have "significantly undermined the efficacy of searching" Sanders's blood, the evidence—and the reasonable inferences from that evidence—show that Neff simply did not seek a warrant because he believed he did not need to. *See id.* at 927. Therefore, the State's reliance on *Cole* is misplaced.

21

We agree with Sanders that this case is more akin to *Weems.* 493 S.W.3d at 576. Like in *Weems*, where the arresting officer immediately observed that Weems had bloodshot eyes, slurred speech, an inability to stand, and a strong smell of alcohol on his breath, here both Russell and Neff observed collectively and immediately that Sanders possessed slurred speech, red and bloodshot eyes, imbalance in her walking, and an odor of alcohol, and she had admitted to having imbibed alcoholic drinks earlier in the day. Both officers also knew that Sanders had been involved in an accident that resulted in multiple fatalities. Also like in *Weems*, where the transport of Weems to the hospital did not involve a significant amount of time, here transporting Sanders to the hospital took only five minutes.

And most significantly, like in *Weems* where the record was devoid of any evidence reflecting "what procedures, if any, existed for obtaining a warrant when an arrestee is taken to the hospital or whether [the arresting officer] could have reasonably obtained a warrant, and if so, how long that process would have taken," here the record is devoid of any evidence of what procedures were in place and how long it would have taken Neff, "Lee", or another officer to procure a warrant. *Id.* at 581. What is evidently clear from this record is that Neff had warrant affidavits on his person and that there was a magistrate five minutes from Neff at the time he arrived at the hospital. A reasonable inference from the evidence is that during the more than one hour fifteen minutes between the time Neff arrived on the scene and observed Sanders exhibiting signs of intoxication

22

and the time Neff signed the order to draw Sanders's blood, Neff never even attempted to undertake one step toward procuring a warrant.

The State argues that Sanders's boyfriend contributed to Neff's inability to obtain a warrant by stopping Neff from completing field sobriety tests and asking that Sanders, who it was later determined had a broken ankle, be examined by medical personnel. Even assuming that this was a slight interference complicating Neff's investigation, it is again like *Weems*, wherein Weems's forty minutes of secreting himself away was a factor counting in favor of the officer's decision not to seek a warrant, but it was a factor that the *Weems* court nonetheless calculated as insufficient to militate against a finding that practical problems prevented the State from obtaining a warrant. *See id.* at 582.

We conclude, as the *Weems* court did, that the totality of the circumstances found on this record militates against a finding that practical problems prevented Neff from obtaining a warrant within a timeframe that preserved the opportunity to obtain reliable evidence of Sanders's blood alcohol content. We overrule the State's sole point.

## IV. CONCLUSION

Having overruled the State's sole point, we affirm the trial court's order granting Sanders's motion to suppress.

/s/ Bill Meier
BILL MEIER
JUSTICE

23

PANEL:  WALKER and MEIER, JJ., and KERRY FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

KERRY FITZGERALD filed a dissenting opinion.

PUBLISH

DELIVERED:  December 14, 2017