# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### ON REMAND

---

### NO. 03-16-00727-CR

---

**The State of Texas, Appellant**

**v.**

**John Phillip Couch, II, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
NO. CR2013-444, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING**

---

### O P I N I O N

This cause is before us on remand from the Texas Court of Criminal Appeals. On original submission, this Court considered whether the District Court abused its discretion in granting the motion to suppress of appellee John Phillip Couch, II, who argued that the State had violated his Fourth Amendment rights by drawing his blood without a search warrant. This Court concluded that the warrantless blood draw was justified by exigent circumstances and reversed the District Court's order for that reason. *See State v. Couch*, No. 03-16-00727-CR, 2018 Tex. App. LEXIS 8855, at \*17–19 (Tex. App.—Austin Oct. 31, 2018) (mem. op., not designated for publication). After this Court issued its opinion and judgment, the Court of Criminal Appeals issued an opinion that addressed the deference a reviewing court owes to a

trial court's findings of fact and conclusions of law in cases involving claims of exigent circumstances. *See State v. Garcia*, 569 S.W.3d 142, 148–52 (Tex. Crim. App. 2018). Because this Court did not have the benefit of *Garcia* when it issued its previous opinion, the Court of Criminal Appeals remanded this cause to us for reconsideration. For the following reasons, we affirm the District Court's order granting Couch's motion to suppress.

## BACKGROUND[1]

At approximately 7:53 p.m. on February 25, 2012, Texas Department of Public Safety Trooper David Kral was notified of a vehicle collision in Comal County, on FM 306 near Canyon Park Road. Kral arrived at the scene approximately 30 minutes later, at 8:24 p.m. Upon arrival, Kral saw that a Corvette and a Chevy pickup truck had collided in the roadway and were blocking traffic. Emergency personnel and law-enforcement officers were already at the scene. Kral spoke with a sheriff's deputy who informed him that eyewitnesses had observed the driver of the Corvette, later identified as Couch, "driving recklessly within the parking lot" of a convenience store and "attempting to get onto [FM] 306." The deputy added that as the Corvette was exiting the parking lot, it "went into the wrong lane and went head on with another vehicle." There were two individuals in the Chevy pickup at the time of the collision, one of whom was hospitalized with a broken thumb.

As the lead investigator at the scene, Kral was responsible for "[g]athering all the facts as far as where the vehicles were on the roadway," "getting . . . certain documents from the crash," "identifying the other occupants of the crash," "getting witness statements," and speaking

---

[1] The following recitation of facts is based on the evidence admitted at the suppression hearing, including the testimony of the arresting officer, a copy of his offense report, and a copy of a video recording taken from the officer's patrol-car dash camera.

with "the other deputies that were there on scene." Kral was also responsible for completing a written report of the collision. The role of the other officers was to "assist[] with the overall crash scene" by "getting witness statements," "identifying drivers," "getting facts," and "securing the scene, making sure that—that nobody else crashes into these cars while they're just sitting in the middle of the road."

While the other officers were completing those tasks, Kral spoke with Couch. He noticed that Couch "had an abrasion across [the] left part of his head, and he was also complaining of his chest." As a precautionary measure, Kral "brought him over to Canyon Lake EMS personnel," who informed Kral that they had already "checked [Couch] over" and released him because he "had refused any further treatment."

Kral then brought Couch to his patrol car and asked him questions concerning the collision. During the interview, Kral smelled alcohol on Couch's breath. Kral suspected that Couch was intoxicated and proceeded to administer field sobriety tests. Kral estimated that he began conducting the tests approximately 30 minutes after his arrival at the scene and that the tests took approximately 20 to 30 minutes to complete. After conducting the field sobriety tests, Kral asked Couch "if he had anything else in his system or if there's anything else in the car." Couch admitted that there "might" be marijuana in his vehicle, although he denied smoking any marijuana that day. Couch then took a pill bottle out of his pocket that contained marijuana.

Based on the information that he had gathered during his investigation, Kral arrested Couch for driving while intoxicated and possession of marijuana. Before leaving the scene of the collision, Kral spoke with the other officers to inform them of Couch's arrest, to "check the status" of the occupants in the other vehicle, and to ensure that the clean-up of the

3

collision was under control. Kral then transported Couch to a hospital in downtown New Braunfels, a drive that took approximately 45 minutes.

Upon arrival at the hospital, Kral began drafting a search warrant to draw Couch's blood, a process that took approximately 30 minutes to complete. After attempting unsuccessfully to contact a judge who could sign the warrant, Kral decided to forgo the search-warrant process and obtain a sample of Couch's blood without a warrant under the authority of the mandatory-blood-draw statute.[2] Kral explained, "I had every intention [of] getting the warrant. But at some point, like I said, that little light went off in the back of my mind saying there's no reason for me to have to delay this." When asked if he believed that he "would have had time to get a search warrant and adequately get an accurate and reliable blood analysis done on the defendant," Kral answered, "No." Kral obtained a sample of Couch's blood without a warrant at approximately 10:50 p.m., approximately three hours after he had been dispatched to the collision.

The District Court granted Couch's motion to suppress and later made findings of fact and conclusions of law, including that "the overall circumstances of the incident do not

---

[2] *See* Tex. Transp. Code § 724.012(b) (permitting warrantless blood draw if, among other reasons, "an individual other than the [suspect] has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment"). In this case, one of the occupants of the other vehicle had been injured and transported to a hospital for medical treatment. Thus, at the time of Couch's arrest in 2012, the statute permitted Couch's blood to be drawn without a warrant.

However, in 2014, the Texas Court of Criminal Appeals held that "a nonconsensual search of a DWI suspect's blood conducted pursuant to the . . . Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment." *State v. Villarreal*, 475 S.W.3d 784, 815 (Tex. Crim. App. 2014).

demonstrate exigent circumstances so compelling that a warrantless, non-consensual blood draw was objectively reasonable." This appeal by the State followed.

**APPLICABLE LAW**

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." *See* U.S. Const. amend. IV. A blood draw is considered a search for Fourth Amendment purposes. *See Schmerber v. California*, 384 U.S. 757, 767 (1966). "A warrantless search is per se unreasonable under the Fourth Amendment unless it falls within a recognized exception to the warrant requirement." *Garcia*, 569 S.W.3d at 148 (citing *Missouri v. McNeely*, 569 U.S. 141, 148 (2013)). "When the defendant files a motion to suppress evidence on Fourth-Amendment grounds, he has the initial burden of proving that a warrantless search occurred; if he succeeds, the burden shifts to the State to prove that a warrant-requirement exception applies." *Id*. (citing 43 George E. Dix & John M. Schmolesky, *Texas Practice—Criminal Practice and Procedure* § 18:20 (3d ed. 2011)).

"The well-established 'exigent circumstances' exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Id*. (quoting *McNeely*, 569 U.S. at 148–49). "Under this exception, a law-enforcement officer may be justified in conducting a warrantless search 'to prevent the imminent destruction of evidence.'" *Id*. (quoting *McNeely*, 569 U.S. at 149).

"In drunk-driving cases in particular, 'the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case'—but 'it does not do so

5

categorically.'" *Id*. (quoting *McNeely*, 569 U.S. at 156). "Instead, any exigent-circumstances review should be informed by the totality of the facts and circumstances available to the officer and analyzed under an objective standard of reasonableness." *Id*. "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *McNeely*, 569 U.S. at 152.

Relevant factors in the exigency analysis include the officer's knowledge of "the body's natural metabolic process and the attendant evidence destruction over time," "the procedures in place for obtaining a warrant," "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *Id*. at 164; *Weems v. State*, 493 S.W.3d 574, 580 (Tex. Crim. App. 2016); *Cole v. State*, 490 S.W.3d 918, 924 (Tex. Crim. App. 2016). Moreover, when the circumstances include an automobile accident, additional considerations include "the time required to complete the accident investigation," "the lack of available law enforcement personnel" to assist in the investigation, "[t]he accident's severity," and the "potential medical intervention," if any, that the circumstances require. *See Cole*, 490 S.W.3d at 925–27.

**STANDARD OF REVIEW**

In our review of a trial court's suppression ruling, we are guided by the following principles. "First, '[i]n reviewing a trial court's ruling on a motion to suppress, an appellate court must view the evidence in the light most favorable to the trial court's ruling.'" *Garcia*, 569 S.W.3d at 152–53 (quoting *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). "When, as in this case, the trial court 'makes explicit fact findings, the appellate court determines

6

whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings.'" *Id*. at 153. "The reviewing court 'must defer to a trial judge's factual findings which, when . . . read in their totality, reasonably support his legal conclusion'—even if 'viewed piecemeal and in isolation' they might be considered 'ambiguous.'" *Id*. (quoting *State v. Duran*, 396 S.W.3d 563, 566 (Tex. Crim. App. 2013)). "We give the same 'non-technical, common-sense deference' to the trial judge's individual factual findings as we do 'to the totality of those findings.'" *Id*.

Additionally, "[w]e review a trial judge's ruling on a motion to suppress under a bifurcated standard of review." *Cole*, 490 S.W.3d at 922 (citing *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013)). "Reviewing courts should afford 'almost total deference' to the trial judge's findings on matters of historical fact, especially when those findings 'are based on an evaluation of credibility and demeanor.'" *Garcia*, 569 S.W.3d at 148 (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "But 'application[s] of law to fact' or 'mixed questions of law and fact' are entitled to deference only if they 'turn[] on an evaluation of credibility and demeanor.'" *Id*. "Otherwise, they are reviewed de novo." *Id*.

In *State v. Garcia*, the Court of Criminal Appeals clarified how reviewing courts are to apply the bifurcated standard in cases where the State claims that exigent circumstances justified a warrantless search. *See id*. at 148–49. First, the court explained that "a trial judge's findings of historical fact, as long as they find support within the record, are entitled to deference." *Id*. at 149 (citing *Guzman*, 955 S.W.2d at 89). "Findings of historical fact" include "findings as to time and place," such as when and where the collision occurred and when and where the suspect's blood was drawn. *Id*. "Findings of this nature clearly and properly inform[]

7

the trial judge's determination of whether there was time to secure a warrant under an exigent-circumstances analysis." *Id*. (citing *Weems*, 493 S.W.3d at 580-82; *Cole*, 490 S.W.3d at 924-26).

Moreover, "whether an exigency justifies a warrantless search must depend, at least in some measure, upon what facts were actually 'available' to the officer at the time he conducts the search." *Id*. (citing *Weems*, 493 S.W.3d at 579). "[I]n executing their duties, law-enforcement officers are usually aware of some historical facts and unaware of others." *Id*. at 150. "[W]hether an officer was aware of a fact is itself essentially a matter of fact, both subject to deference and crucially relevant to a Fourth-Amendment reasonableness inquiry." *Id*. (citing *Duran*, 396 S.W.3d at 572).

Next, "in assessing the reasonableness of an officer's actions, a reviewing court should take into account not only the facts known to the officer, but also the 'specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *Id*. (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The determination of whether these inferences are "reasonable" under the circumstances is a legal conclusion *not* entitled to deference. *Id*.

Finally, an officer's "subjective motivation" for conducting a warrantless search is "irrelevant" to the exigency analysis. *Id*. In other words, "it does not matter if the officer did not actually infer that he was faced with an exigency; if the known facts objectively support the existence of an exigency, the search should be upheld." *Id*. at 151. "Likewise, it does not matter if the officer subjectively and in good faith inferred that he was faced with an exigency if the known facts objectively counter that inference." *Id*.

"Once the preceding matters are settled," the court determines "whether, in light of the known facts and reasonable inferences therefrom, an objectively reasonable officer would conclude that in the time it would take to secure a warrant the efficacy of the search would be

8

'significantly undermin[ed].'" *Id*. (quoting *McNeely*, 569 U.S. at 152). "This is a Fourth-Amendment 'reasonableness' inquiry, so it is reviewed de novo." *Id*. (citing *Kothe*, 152 S.W.3d at 62-63). "This inquiry should take into account, not only the well-known 'natural dissipation' of alcohol in the body, but also 'the procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a timeframe that still preserves . . . reliable evidence." *Id*. (quoting *Weems*, 493 S.W.3d at 580). The exigency analysis "should be informed by the 'totality of circumstances,' not turning on any one factor to the exclusion of others." *Id*. (quoting *McNeely*, 569 U.S. at 151).

In sum, when analyzing exigency, reviewing courts defer to a trial court's findings on historical facts and whether the officer was aware of those facts at the time of the warrantless search. *Id*. at 149–50. Courts review de novo the trial court's conclusions on the "reasonableness" of any inferences that the officer draws from the historical facts and the trial court's ultimate determination of "whether the totality of facts available to the officer, and reasonable inferences therefrom, objectively suffice to establish an exigency." *Id*. at 151–52.

## ANALYSIS

With the above considerations in mind, we proceed to review the District Court's findings and conclusions in this case. Consistent with the analysis in *Garcia*, we will review the findings in light of the relevant exigency factors present in this record.

**The time required to complete the accident investigation, the lack of available law enforcement personnel to assist in the investigation, and the accident's severity**

The District Court found that Trooper Kral was notified of the accident at approximately 7:53 p.m. and that he arrived at the scene at approximately 8:24 p.m. Prior to

9

Kral's arrival, "approximately 6 other officers had arrived and began securing the scene, directing traffic, and interviewing witnesses." "Upon his arrival, Trooper Kral, as the Accident Investigator, gathered information from the officers." The District Court also found that the accident involved two vehicles and three people and that "there were only minor injuries, but one occupant suffered a broken thumb. That person was transported by ambulance for treatment." The District Court further found that "neither of the vehicles involved in the accident were overturned, no extreme action was needed to extract any of the passengers from either vehicle, and no extraordinary efforts were needed to clear the scene."

Additionally, Kral testified that he arrested Couch at 9:04 p.m., approximately 40 minutes after he arrived at the scene, and that he was able to leave the scene approximately 10 to 20 minutes later, after he had determined that the clean-up of the collision was underway. Thus, approximately an hour had elapsed between the time Kral arrived at the scene and the time he completed his investigation of the collision.

Kral testified that he could not begin to draft a warrant until after he had transported Couch to the hospital, which further delayed the warrant process. However, on cross-examination, Kral acknowledged that it was at least possible that one of the other officers "could have" taken Couch into custody and transported him to the hospital, although he did not believe it would have been "practical" for them to do so given their other duties. Kral also testified that, although he did not ask the other officers to assist him, he did not think they would have refused to help him if he had asked.

Moreover, Kral testified that he was "unsure" what each individual officer was doing, specifically, during the investigation. Thus, this was not a case in which the record reflects that each officer was preoccupied with an essential task that would have prevented that

10

officer from assisting Kral. *Cf. Cole v. State*, 490 S.W.3d 918, 926 (Tex. Crim. App. 2016) (concluding that other officers could not have assisted lead investigator in obtaining warrant because each officer was "performing important law enforcement or public-safety duties" and that "taking any one of them away . . . would have left a necessary duty unfulfilled"). Accordingly, the record supports the District Court's finding that it was possible that other law-enforcement officers could have assisted Kral in taking Couch into custody and transporting him to the hospital.

**Potential medical intervention**

In *Garcia*, the Court of Criminal Appeals held that "if an officer is actually aware of facts from which an objectively reasonable officer could conclude that an evidence-destroying medical treatment is imminent, the Fourth Amendment allows the officer to take any reasonable steps to preserve the integrity of the imperiled evidence." *Id*. at 155. Here, however, the District Court found that "it was unlikely that potential medical intervention at the hospital would have impeded or delayed Trooper Kral from being able to promptly take a blood specimen from the defendant by warrant."

The record supports this finding. Although Kral testified that Couch "had an abrasion across [the] left part of his head" and was complaining of chest pain, EMS personnel had informed Kral upon his arrival at the scene that they had already "checked [Couch] over" and released him after he "had refused any further treatment." Thus, Couch's injuries were not so serious as to require either ongoing supervision by EMS at the scene or immediate transport to the hospital in an emergency vehicle. Moreover, upon his arrival at the hospital, Kral did not take Couch immediately inside the hospital for treatment. Instead, the video recording from

11

Kral's patrol-car dash camera reflects that Couch remained inside the vehicle for approximately 30 minutes, making personal calls on his cell phone and conversing occasionally with Kral while the officer drafted a warrant on his laptop. Kral testified that Couch was not "with any urgency asking to be checked out by one of the doctors." Rather, Kral believed that "since we're at the hospital, [Couch] might as well get checked out if he needed to or if he felt like he needed to." Although Kral testified that the administration of pain medication or a saline solution could have interfered with the accuracy of the blood specimen, there is nothing in the record to indicate that Kral was aware that any such treatment was "imminent." When asked if there was "any sort of medical intervention that prevented [him] from getting a specimen," Kral testified, "No, sir." Kral explained that "the doctor decided to do a CAT scan," after which Couch "was released from the hospital with [a] negative finding from the doctor." These circumstances support the District Court's findings "that there was no sort of medical intervention that prevented [Kral] from getting a specimen" and "there were no concerns that medical intervention would cause delay if [Kral] had taken more time to get a search warrant." *See id*. at 154–58.

**The officer's knowledge of the body's natural metabolic process and the attendant evidence destruction over time**

The District Court found that "Trooper Kral knew that alcohol and other substances metabolize, but no credible evidence was presented about the rate of that metabolization." The record supports this finding. Kral testified generally that "it's natural that the human body metabolizes alcohol, so it dissipates after a certain point" and that "the longer that we wait past the time of arrest, the lower that blood alcohol content is going to be." However, Kral provided no testimony regarding his awareness of the approximate amount of

12

time that it takes for alcohol to dissipate in a person's blood. Such awareness is important to the exigency analysis "because an individual's alcohol level *gradually* declines soon after he stops drinking." *McNeely*, 569 U.S. at 152 (emphasis added). Therefore, "a *significant* delay in testing will negatively affect the probative value of the results." *Id*. (emphasis added). On the other hand, "a minimally delayed test when dealing with an alcohol-related offense does not drain the test of reliability because experts can work backwards to calculate blood-alcohol content at an earlier date." *Cole*, 490 S.W.3d at 927. Here, there is nothing in the record to indicate that Kral was aware of the approximate amount of time that would constitute a "significant" as opposed to a "minimal" delay in obtaining a blood specimen. *Cf. McNeely*, 569 U.S. at 152 (crediting testimony indicating that "the percentage of alcohol in an individual's blood typically decreases by approximately 0.015 percent to 0.02 percent per hour once the alcohol has been fully absorbed").

Kral also testified that he was concerned that there might be marijuana in Couch's blood, although he "had no idea" of the rate at which marijuana metabolizes in a person's body.[3] The Court of Criminal Appeals has held that the possible presence of substances other than alcohol in a person's bloodstream can support a finding of exigency, even when the substance lacks a "known elimination rate." *See Cole*, 490 S.W.3d at 926–27. This is because, "without a known elimination rate of [the other substance], law enforcement faced inevitable evidence destruction without the ability to know—unlike alcohol's widely accepted elimination rate—how much evidence it was losing as time passed." *Id*. at 927. However, for the other substance to be considered in the exigency analysis, the record must show "how or why the officer[] might

---

[3] Kral added, however, that he believed "marijuana stays in the body a lot longer than [] alcohol does."

reasonably have suspected that [the person] was also using" that other substance. *Garcia*, 569 S.W.3d at 154. Here, there was evidence presented that Couch had marijuana in his pocket at the time of the accident, which provided a basis for Kral's suspicion that Couch was using marijuana. Accordingly, Kral's suspicion that Couch was using marijuana can be considered in the exigency analysis. *Cf. id.* (concluding that presence of cocaine in defendant's blood could not be considered in exigency analysis because officers had no reason to suspect that defendant was using cocaine). In that analysis, Kral's testimony that he "had no idea" of the rate at which marijuana metabolizes in a person's body supports the District Court's findings that "no credible evidence was presented about the rate of [marijuana] metabolization" and that "there was no credible evidence that the short delay caused by obtaining a warrant would have substantially undermined the efficacy of the blood search."

**The procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence**

The District Court found that "several months prior to the accident, a '24/7 no-refusal policy' had been implemented which enabled officers to [4] obtain warrants for blood-alcohol draws when a suspect refused to consent. Judges were available in Comal County to sign warrants 24 hours a day, seven days a week. Trooper Kral was able to prepare affidavits and search warrants using the laptop in his car. He could have either faxed this to a judge for signature or could have printed and notarized it at the hospital and had a judge come to the hospital to sign it."

---

[4] The District Court's finding stated initially that the policy enabled officers to "expeditiously" obtain warrants. However, the District Court sustained the State's objection to the finding's characterization of the warrant process as "expeditious."

14

The District Court also found that

> [I]t would have taken only a short period of time longer for Trooper Kral to obtain Mr. Couch's blood with a warrant than taking it by demand. Trooper Kral started drafting the search warrant after he arrived at the hospital at about 10:05. He then requested that a magistrate come to the hospital to sign the warrant. While Trooper Kral eventually abandoned his work on the warrant to pursue an easier means of obtaining the Defendant's blood, obtaining a warrant was feasible. Trooper Kral had the option of faxing the warrant request to a judge for signature. It would have taken twenty minutes to two hours to have the warrant signed. Trooper Kral obtained the blood specimen from the Defendant at 10:50. Had he instead obtained a warrant, Trooper Kral would have likely obtained the Defendant's blood by about 11:05, give or take 15 minutes.

The record supports these findings. Kral acknowledged there was a "24/7 no-refusal policy" in place in Comal County at the time of Couch's arrest that provided "access and mechanisms" for officers to obtain search warrants, although Kral disputed the characterization of this policy as "an easy process." Kral also testified as to the amount of time that it had taken him to obtain a warrant on prior occasions. Kral recounted that it took him "roughly 30 minutes" to write, type, and print a warrant. Then, "after completing it, proofreading it, [Kral] would determine which judge needed to be notified, and then figure out whether . . . there's a judge that will come to the hospital and personally sign it." Kral testified that the "majority of the judges just do it by fax." Kral estimated that the "best-case scenario" for obtaining a warrant was "45 minutes to an hour," which represented the "total time" from when he started drafting the warrant to when the judge signed it. He added that "roughly 20 minutes" was "the fastest ever" that a judge had signed a warrant after Kral had it ready for the judge's signature. Kral estimated that the "worst-case scenario" for obtaining a warrant was "an hour and a half, two hours." Based on these estimates, Kral agreed that from the time he arrived at the hospital with Couch, under the best-case scenario, it would have taken him "another 50 minutes" to obtain a warrant and, under the worst-case scenario, "another 1.5 to two hours."

15

The video recording taken from Kral's patrol-car dash camera also supports the District Court's findings. The recording showed that upon Kral's arrival at the hospital with Couch, Kral opened his laptop computer and began immediately drafting a warrant. Approximately 15 minutes later, Kral called dispatch and requested the assistance of another officer to help him with the blood draw. That officer arrived approximately 11 minutes later and began discussing the warrant process with Kral, including the process of getting the warrant printed, notarized, and faxed to a judge. The officer informed Kral that "all but one" of the judges are willing to go to the hospital and sign the warrant in person and that one judge in particular "loves" to go to the hospital. Kral then proceeded to call two of the judges within a span of approximately three minutes and left a voice message with each. However, several minutes later, rather than wait for either judge to return his call, Kral indicated that he was going to draw Couch's blood without a warrant. Thus, the record supports the District Court's findings that "obtaining a warrant was feasible" and that if Kral had obtained a warrant, he "would have likely obtained the Defendant's blood by about 11:05, give or take 15 minutes."

**Totality of the circumstances**

As the above discussion indicates, there are facts both in support of and contrary to a determination of exigency in this case. As this Court explained in its opinion on original submission, the circumstances in support of a determination of exigency included a two-vehicle collision that had resulted in minor injuries and that was blocking the road; the need for multiple officers to investigate that collision; a DWI suspect who, before his blood could be drawn, needed to be transported to a hospital that was approximately 45 minutes from the scene of the collision; two unsuccessful attempts by the arresting officer to contact a judge who could sign a

16

search warrant; and a possibility that obtaining a search warrant could delay the blood draw by at least another hour. Additionally, the officer had reason to suspect that in addition to alcohol, there was also marijuana, a substance with an unknown elimination rate, present in Couch's blood.

On the other hand, the collision did not result in serious injuries; Trooper Kral was able to complete his investigation, arrest the suspect, and depart the scene within an hour after he had arrived; there was an absence of evidence demonstrating that other officers would have been unable to assist Kral in transporting Couch to a hospital if Kral had asked for their help; there were procedures in place that enabled judges to sign search warrants either by fax or in person, and there were multiple judges who could be contacted to do so; there was an absence of evidence indicating that Kral was aware of the approximate amount of time that constituted a "significant" delay in obtaining a blood specimen; there was a possibility that obtaining a warrant would result in only a minimal delay to the blood draw; and there was nothing in the record to suggest that Kral was actually aware that "evidence-destroying medical treatment was imminent" while Couch was at the hospital.

Viewing the above evidence in the light most favorable to the District Court's ruling, and deferring to its factual findings that are supported by the record, we conclude that it was not objectively reasonable, in light of the known facts and reasonable inferences therefrom, for Trooper Kral to decide that in the time it would take to secure a warrant, the efficacy of a search would be "significantly undermined." *See Garcia*, 569 S.W.3d at 152–57; *Weems*, 493 S.W.3d at 580–82; *State v. Sanders*, 535 S.W.3d 891, 901–02 (Tex. App.—Fort Worth 2017, pet. ref'd); *Colura v. State*, 510 S.W.3d 218, 224–25 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Accordingly, the District Court's findings and conclusions are supported by the record,

17

and the District Court did not err in determining that the State failed to carry its burden to prove that the warrantless blood draw was justified by exigent circumstances.  We overrule the State's issue on appeal.

## CONCLUSION

We affirm the District Court's order granting Couch's motion to suppress.


_____

Gisela D. Triana, Justice


Before Chief Justice Rose, Justices Goodwin and Triana

Affirmed on Remand

Filed:  August 29, 2019

Publish